IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 11, 2019 Session

## STATE OF TENNESSEE v. RODNEY DARNELL ROBINSON

**Appeal from the Criminal Court for Davidson County
No. 2015-B-1239     Cheryl A. Blackburn, Judge**

_____

### No. M2019-00303-CCA-R3-CD

_____

Rodney Darnell Robinson ("Defendant") was convicted in Davidson County Criminal Court of two counts of child abuse, five counts of aggravated sexual battery, four counts of rape of a child, two counts of sexual battery by an authority figure, two counts of rape, and one count of attempted rape of a child, for which he received an effective sentence of sixty years' incarceration. On appeal, Defendant contends that: (1) the evidence was insufficient to support his convictions; (2) he was denied the effective assistance of counsel; (3) the trial court erred by allowing trial counsel to proceed while "clearly ill"; (4) the trial court failed to remedy statements made during voir dire by a potential juror, thereby depriving Defendant of a fair trial; (5) the trial court erred in allowing cumulative testimony in the cross-examination of Defendant; (6) the trial court erred in allowing improper leading questions to a witness; (7) the trial court erred in the admission of certain evidence; (8) the trial court erred in the exclusion of certain evidence; (9) there was an appearance of bias from the trial judge that violated Defendant's due process rights; and (10) cumulative error requires a new trial. Following a thorough review, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Benjamin K. Raybin (on appeal) and Brent Horst (at trial), Nashville, Tennessee, for the appellant, Rodney Darnell Robinson.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Megan King and Doug Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

In September 2012, the Davidson County Grand Jury indicted Defendant, along with his wife, Demetria Leshe Robinson ("Co-Defendant Robinson"), for twenty-five different offenses relating to allegations of child abuse and sexual abuse made by two fourteen-year-old girls living in their home. In May 2015, the grand jury issued a superseding indictment, charging Defendant and Co-Defendant Robinson with the following offenses:

| Indicted Count | Renumbered Count | Charged Offense | Classification | Victim |
|---|---|---|---|---|
| 1 | N/A | Aggravated Child Abuse | Class B felony | K.B. |
| 2 | N/A | Aggravated Child Abuse | Class B felony | K.B. |
| 3 | 1 | Aggravated Sexual Battery | Class B felony | K.B. |
| 4 | 2 | Aggravated Sexual Battery | Class B felony | K.B. |
| 5 | 3 | Aggravated Sexual Battery | Class B felony | K.B. |
| 6 | 4 | Rape of a Child | Class A felony | K.B. |
| 7 | 5 | Rape of a Child | Class A felony | K.B. |
| 8 | 6 | Rape of a Child | Class A felony | K.B. |
| 9 | 7 | Sexual Battery by an Authority Figure | Class C felony | K.B. |
| 10 | 8 | Sexual Battery by an Authority Figure | Class C felony | K.B. |
| 11 | 9 | Sexual Battery by an Authority Figure | Class C felony | K.B. |
| 12 | 10 | Rape | Class B felony | K.B. |
| 13 | 11 | Rape | Class B felony | K.B. |
| 14 | 12 | Rape | Class B felony | K.B. |

| 15 | 13 | Aggravated Sexual Battery | Class B felony | B.B. |
|---|---|---|---|---|
| 16 | 14 | Aggravated Sexual Battery | Class B felony | B.B. |
| 17 | 15 | Aggravated Sexual Battery | Class B felony | B.B. |
| 18 | 16 | Rape of a Child | Class A felony | B.B. |
| 19 | 17 | Rape of a Child | Class A felony | B.B. |
| 20 | 18 | Rape of a Child | Class A felony | B.B. |
| 21 | 19 | Sexual Battery by an Authority Figure | Class C felony | B.B. |
| 22 | 20 | Sexual Battery by an Authority Figure | Class C felony | B.B. |
| 23 | 21 | Sexual Battery by an Authority Figure | Class C felony | B.B. |
| 24 | 22 | Rape | Class B felony | B.B. |
| 25 | 23 | Rape | Class B felony | B.B. |
| 26 | 24 | Rape | Class B felony | B.B. |

The trial court subsequently severed the defendants' cases for trial and granted Defendant's request to sever Counts 1 and 2 from the remaining counts of the indictment. Following a trial on Counts 1 and 2 in June 2015, Defendant was convicted of the lesser-included offense of child abuse in both counts. As set out above, the remaining counts of the indictment were renumbered for the purposes of Defendant's second trial in February 2017, which is the subject of this appeal.

**Second Trial**

Voir Dire

During voir dire, one potential juror, Mr. Sparks, stated that he had previously served on the grand jury in Dickson County. When asked if he could set aside his experience with the grand jury and apply a presumption of innocence to Defendant, Mr. Sparks said, "[I]n all honesty, in the grand jury we didn't indict anybody unless they had them cold. . . . So in all honesty I'm sitting here thinking, well, [Defendant] wouldn't be

here if they didn't have him cold already." He further stated, "I remember at that grand jury . . . any question about them at all, about possible innocence, they were dismissed." The trial court excused Mr. Sparks based on his responses. Defendant's trial counsel requested that the trial court explain to the potential jurors that "the grand jury does not hear all of the evidence." The trial court then instructed:

> Just so it will benefit the others, a grand jury does not hear all of the evidence and oftentimes they don't even hear from the alleged victim. They just hear some summary of the things. But I just want to make sure everybody else can provide [Defendant] with the presumption of innocence. Can you do that? Because . . . he only has to be here, and that's it. The State has to prove him guilty. He doesn't have to do anything. [Trial counsel] doesn't have to do anything. He doesn't even have to ask any questions. I suspect he will, but he doesn't have to. All the burden is on the State. Can everybody accept that principle of law?

> (Jurors move heads up and down.)

Opening Statement

During Defendant's opening statement, trial counsel asserted:

> The evidence will show these allegations were likely initiated and started by the biological mother to these two children who otherwise could have never gotten custody of these two children but because of these allegations eventually did.

> . . . .

> So things went along pretty smoothly from there for about six years, from 2006 to 2012, with . . . the biological mother, only having periodic and sporadic contact with her children. She would call now and again, and there's even probably a long period of time where she had no contact with them. But she had minimal to no contact with the children for those several years.

Trial counsel explained that, on March 14, 2012, Defendant punished K.B.[1] with a "good whooping" that was "in all honesty hard and harsh." He stated that the whipping left bruises that were noticed the following day at school and reported to the Department of Children's Services ("DCS"). Trial counsel continued:

It's very important to note that on that day, . . . [K.B.] never once mentioned anything about sexual abuse. Now, the State's theory or attempt to explain this is that, well, she didn't know any better because she . . . thought what the [defendants] were doing was normal or allegedly doing was normal. But I would submit to you that what really happened was -- there's evidence to show -- that the very next day, March 16th, before [K.B.] ever alleged sexual abuse to anyone, [the victims' mother] swoops in. I think DCS calls her and says, look, we're not going to let the children go home with the [defendants] tonight, can they stay with you or something like that. For some reason, the children or [K.B.] ends up seeing or speaking with [the victims' mother] the next day. And [the victims' mother] says that she saw a tampon in [K.B.'s] purse, so she thought that was odd. So immediately she jumps to the conclusion, well, maybe [Defendant] is sexually abusing my child because she's too young to be using tampons. So she starts quizzing [K.B.] have you been sexually abused by [Defendant].

Now, what I won't be able to answer for you from the evidence is, you know, was that [the victims' mother] coaching an allegation because she saw an opportunity or is that [K.B.] using an opportunity to explain a tampon because she didn't want to explain to her mother why she had a tampon in her purse if she wasn't sexually active. But what I can tell you is that there was no allegation of sexual abuse until [the victims' mother] . . . who as I said had no chance otherwise of getting custody of these children, is in the picture bringing up the subject. So guess what. The very next day or close to it -- I may be a little bit off on my timing here -- during an official interview by authorities, yes, now [K.B.] says, oh, by the way, yes, I was also sexually abused.

Trial counsel explained that K.B.'s sister, B.B., did not disclose any sexual abuse in her initial interview. However, when DCS interviewed B.B. in June 2012, she stated that she was sexually abused too. Trial counsel stated:

---

[1] It is the policy of this court to refer to minor victims of sexual abuse by their initials only. We intend no disrespect.

What happened between March and June to change [B.B.'s] mind? [The victims' mother] had a conversation with [B.B.] The . . . proof will show, that in April [the victims' mother] . . . who had no chance of getting custody of these children otherwise, went to DCS and says, well, I've been speaking with [B.B.] and she was sexually abused, too. So what do these allegations have in common? They both start with [the victims' mother]. Neither [K.B.] nor [B.B.] ever alleged sexual abuse to anyone until they . . . spoke with [their mother.]

Trial counsel asserted that there were other motives for K.B. and B.B. to make up the allegations of sexual abuse. He said that the defendants were "very strict" but that the victims' mother "let them do pretty much whatever they wanted." Trial counsel also stated that K.B. and B.B. "always wanted to go back and live with their mother." He asserted, moreover, that K.B. was angry about the whipping she received from Defendant and that she made the allegations to "get even" with Defendant and Co-Defendant Robinson. Trial counsel noted that there was no physical evidence to support the claims of sexual abuse, no confessions, and no witnesses who "ever saw inappropriate behavior" by the defendants. Trial counsel continued, "The evidence is simply the allegation of two individuals . . . and I believe you'll see much of their statements will be inconsistent, and the whole story is simply not credible."

<u>State's Proof</u>

K.B. testified that she was born in June 1997 and that she was nineteen years old at the time of trial. She explained that she had a twin sister, B.B., and that they lived with their biological mother and three siblings until she and B.B. were six years old. K.B. explained that because their mother was "about to lose her house," she and her siblings went to stay with Defendant and Co-Defendant Robinson. K.B. said that she continued to see her mother while living with the defendants until K.B. was in sixth grade. She recalled that her mother had visitation on Thursdays but said that, in sixth grade, her mother "stopped coming over[.]"

K.B. testified that she lived with Defendant and Co-Defendant Robinson for eight years. During those eight years, they lived in two different houses—one on Woodview Circle and the other on Ewingdale Drive. K.B. stated that she lived in the home on Woodview Circle until she was about ten years old. She explained that she eventually began referring to Defendant as "Daddy" and Co-Defendant Robinson as "Mama."

K.B. said that Defendant began touching her when she was ten years old, when her breasts were developing. She recalled that she was in Defendant's bedroom in the home on Woodview Circle when Defendant first touched her breasts. She explained, "I was

starting to grow my breasts, and [Defendant] called me in the room to have a talk about me growing into a lady and teaching me about my breasts, like touching them and stuff." She said that she did not wear a bra at that time; she took off her shirt, and Defendant touched her breasts and talked to her about them. K.B. testified the next time that she could recall Defendant touching her breasts occurred when they were living in the house on Ewingdale Drive, and she was about twelve years old. K.B. recalled that she knocked on the door to Defendant's bedroom and entered the room. She told Defendant that she "couldn't feel [her] nipple[.]" Defendant told her to take off her bra, and Defendant began touching her breasts. He then "put his mouth on [her] nipple to see if [she] could feel it."

The following exchange then occurred:

> [THE STATE]: After that, do you remember another time that [D]efendant touched you?
>
> [K.B.]: Yes. Are you asking about my breasts or . . .
>
> [THE STATE]: Yes, ma'am.
>
> [K.B.]: Yes. I mean, he's touched me over ten times basically doing the same thing.

When asked for additional specific times that Defendant touched her breasts, K.B. stated that it was difficult to recall specific times because Defendant consistently touched her breasts from the ages of ten to fourteen. She said that, between the ages of ten and fourteen, Defendant touched her breasts "at least twice a week." She said that she felt scared and uncomfortable when Defendant touched her breasts.

K.B. recalled the first time that Defendant touched her vagina, stating, "One time I got out the shower too fast, and he said I got out the shower too fast and to come in there so he could check me. So I laid [sic] on the bed and spread my legs wide open, and he checked me." She said that Defendant told her to lie on the bed and open her legs "wide open." She stated that Defendant "use[d] his two fingers and spread the lips [of her vagina] open." She recalled that she was eleven years old the first time this happened. Defendant said that she "wasn't clean" and made K.B. get back into the shower. She stated that Defendant gave her a "whooping" with a belt when she got out of the shower.

K.B. recalled another time that Defendant touched her vagina. She stated that she was twelve years old, and the incident occurred in Defendant's bedroom. K.B. explained, "We [were] having a conversation about sex, and he asked me did I know where my

cherry was. And I told him no." K.B. said that she took off her pajama pants and underwear and lay down on Defendant's bed. K.B. continued:

> He asked would I like for him to show me. Well, anyways I said yes because I didn't know what it was. So I laid [sic] on the bed and -- well, I took my pants off, I laid on the bed, and he stuck his finger up that part[.]

> . . . .

> He was like, do you feel that. And I said, yeah. He said, that's your cherry. I said, okay. And that's how I started wearing tampons.

K.B. testified that Defendant touched her other times after she "g[ot] out of the shower too quick." She said:

> I'd get out the shower, he'd call my name. I went in his room and it was like, you got out the shower too quick, let me check you. So I'd lay on the bed -- well, I would take my pants off first, lay on the bed, and open my legs up wide. And he would take his fingers and open the lips (indicating). He would move that around to make sure there's no dirt in the creases (indicating), pull this up to make sure [there was] no dirt around the clitoris.

She said that it felt like Defendant was "kind of massaging [her] clitoris" and that he began touching her clitoris when she was about twelve years old.

K.B. estimated that, between the ages of eleven and twelve, Defendant touched her vagina once a week and that, between the ages of thirteen and fourteen, it would happen twice a week. She said that Co-Defendant Robinson was not present during the times Defendant touched her vagina. She said that it made her feel uncomfortable and that she would "shake real bad." K.B. recalled one time when Defendant was lying in bed without any clothes on. She said that Defendant called her into his bedroom and told her to lie on top of him. K.B. stated that she could tell Defendant was "getting aroused[.]"

K.B. further recalled that Defendant tried to teach her how to kiss one time. She stated that they were in the garage sitting on a couch when Defendant kissed her on the lips and "tried to put his tongue in [her] mouth[.]" She stated that, during the eight years that she lived with the defendants, the only person she talked to about Defendant's sexual abuse was B.B. She explained that she did not think that what Defendant was doing to her was wrong at the time. K.B. stated, "I mean, he was my daddy, so I didn't think it was wrong. I guess I thought he knew what he was doing because he had a whole

- 8 -

collection of doctor books in the closet on the bookshelf." K.B. testified that she did not consistently see her mother during the eight years she lived with the defendants. She said that she would "sneak and talk to her [mother]" but testified that she never told her mother about Defendant's sexual abuse.

K.B. recalled that, on March 14, 2012, she and her siblings were removed from Defendant's home. She said that she had called a neighbor, Mary Moore, and had asked if she could attend a Bible study with Ms. Moore. Ms. Moore had told K.B. to ask Co-Defendant Robinson; however, K.B. had forgotten to do so. Later that day, when Ms. Moore arrived at Defendant's home, Ms. Moore and Co-Defendant Robinson went outside. When Co-Defendant Robinson came back into the house, she began pulling K.B.'s hair and "beating on [her]." Co-Defendant Robinson instructed K.B. to go upstairs to Defendant. K.B. testified that Defendant told her to take off all her clothes and lie on the bed. He then "whooped" her with a leather belt. Defendant hit her on her bottom, the back of her thighs, back, and arms. She estimated that Defendant hit her ten times. She said that he also hit her with his fist in the face, causing her nose to bleed. K.B. testified that, after the beating, she cleaned up her face and went downstairs. Co-Defendant Robinson told B.B. to "throw [K.B.] some clothes downstairs." Co-Defendant Robinson then took K.B. and B.B. to juvenile detention. She recalled that they "sat in the front of juvenile, and [Co-Defendant Robinson] was just yelling and stuff." K.B. said that they did not get out of the car and that they eventually returned home.

While at school the following day, K.B.'s friend noticed bruises on K.B.'s arm and asked her "what was going on." K.B. and her friend ran out of the classroom and were followed by a teacher. When the teacher threatened to write-up K.B. and her friend, K.B. told the teacher what happened the previous night. K.B.'s teacher then reported the abuse to DCS. Thereafter, a DCS employee, Jennifer Leeman, came to the school to speak to K.B. K.B. testified that she did not return to Defendant's home. Instead, she and her siblings stayed with Janice Dillard, Co-Defendant Robinson's mother, for several weeks.

K.B. testified that, on March 16, 2012, she met with a nurse, Carrie Donnell, at Vanderbilt Hospital. The following exchange then occurred:

> [THE STATE]: Between the time that the belt marks were discovered on your body and the time you met with [Ms.] Donnell did you see your biological mother . . . ?
>
> [K.B.]: No.
>
> [THE STATE]: Did you talk to her?

[K.B.]: No.

[THE STATE]: And at that point how long had it been since you had spoken to [your mother]?

[K.B.]: Three years.

[THE STATE]: And did you -- at that point did you even know how to get in touch with her?

[K.B.]: No.

K.B. recalled that, during Ms. Donnell's examination, she asked K.B. if anyone ever touched her "inappropriately." K.B. said "no" but then said that Defendant "check[ed]" her and that "he showed [her] where [her] cherry was[.]" She also told Ms. Donnell that Defendant touched her breasts. K.B. stated that, in response, Ms. Donnell "looked at me like disgusted." K.B. said she did not realize that Defendant's actions were not normal until Ms. Donnell responded in that manner to her disclosure.

On March 21, 2012, K.B. went to Nashville Children's Alliance where she was interviewed about the sexual abuse allegations. K.B. said that she and her siblings lived with Ms. Dillard for three weeks, and then they moved in with their mother. K.B. stated that, after moving in with her mother, her mother "read[] some papers" containing K.B.'s allegations and that this was how her mother found out about the sexual abuse. She said that she only told her mother about Defendant's abuse when her mother confronted her.

On cross-examination, K.B. stated that, between the ages of ten and eleven, Defendant "checked" her vagina once a week and her breasts twice a week. She acknowledged that, over four years, that would be a "couple hundred" times. K.B. did not recall going to Our Kids Center at Nashville General Hospital with her mother. She explained that, one time, she asked her mother for a tampon, and her mother asked her why she was using a tampon. K.B. said that she did not reply to the inquiry, and her mother then asked if Defendant touched her inappropriately.

K.B. agreed that, when Defendant whipped her with the belt on March 14, 2012, it hurt and made her angry. She agreed that Defendant and Co-Defendant Robinson were strict, would not let her date, and would not let her on Facebook. She acknowledged that she always wanted to go live with her mother; she stated that her mother also had rules but agreed that her mother was more lenient. She said that she had her own Facebook account when she was sixteen "about to turn seventeen." She denied that she was dating by June 2012, a few months after coming to live with her mother. K.B. agreed that she

- 10 -

missed a lot of school while living with her mother and that she did not graduate from high school. K.B. said that she was placed in a foster home for about a week because of truancy and then returned to her mother's home. K.B. denied ever hitting Co-Defendant Robinson and said that she was never violent when living in Defendant's home.

K.B. agreed that, when she testified at another proceeding on July 1, 2013, she said that there was no noticeable injury to her nose after Defendant hit her, in contradiction to her trial testimony that her nose was swollen. K.B. acknowledged that she occasionally called her mother from school when she was in the fifth grade. She would tell her mother that she was "getting beat[,]" and her mother would say that she was trying to regain custody of K.B. and her siblings. She agreed that she previously testified it was Co-Defendant Robinson who ordered her to take off her clothes before Defendant hit her with the belt.

On redirect examination, K.B. denied that her mother told her to make up allegations of sexual abuse against Defendant. She stated that, when she went to Vanderbilt Hospital on March 16, 2012, she told Ms. Donnell that Defendant had touched her vagina to make sure she was clean and so that she would know where her clitoris was located. K.B. also told Ms. Donnell that Defendant checked her breasts because they were different sizes. She agreed that Ms. Donnell was the first person to whom she disclosed Defendant's sexual abuse.

B.B. testified that she was born in June 1997 and that she was K.B.'s twin sister. She explained that she lived with her biological mother until she was six years old. She then moved in with Defendant and Co-Defendant Robinson, along with K.B. and their younger siblings. B.B. recalled that she lived with Defendant for eight years and moved out at age fourteen.

The following exchange then occurred:

[THE STATE]: Okay. During those eight years can you tell the jury about how many times or how much contact you had with your mother . . . ?

[B.B.]: Well, I had to sneak and do it, so it wasn't often. It was every now and then, so I really can't tell you.

[THE STATE]: Okay. Were there long periods where you didn't have any contact?

[B.B.]: Yes.

- 11 -

[THE STATE]: Okay. Can you give the jury just an estimate of like how long it would be sometimes?

[B.B.]: It could be a year.

B.B. recalled that, during the time she stayed with the defendants, they lived in two different homes, one of which was located on Ewingdale Drive. B.B. stated that, during the eight years she lived with Defendant and Co-Defendant Robinson, Defendant touched her breasts and vagina multiple times. She testified, "My first time I wasn't as developed as my sister, so he didn't check my breasts. He just checked my vagina with his two fingers, opened it like that (indicating) and used his middle finger to rub my clitoris. That was the first time." B.B. stated that the abuse started when she was eight years old and that the incident occurred in Defendant's bedroom. She recalled, "He called my name when I got out [of] the shower. He told me to come to his room. I came to his room, and he told me to take my clothes off." She said that Defendant then directed her to lie on the bed and open her legs.

B.B. testified that the next incident she could specifically recall happened when she was ten or eleven. She said, "I was more developed at the top, so that's when he . . . said the doctor said to check them like that, so that's how he was checking my breasts like that." She said that Defendant told her he was checking her breasts for "lumps[.]" She stated that, on this occasion, Defendant checked both her breasts and her vagina and that it happened after she had taken a shower. She said that, when checking her vagina, Defendant "used his two pointed fingers to open [her vagina] and his middle finger to rub [her] clitoris."

B.B. recalled the next specific time she remembered the abuse happening. She said, "I got out [of] the tub, but this time he didn't check my vagina or my breasts. He just smelled my neck, up under my arms, and opened my butt and smelled my butt." She stated that Defendant was lying in bed and that neither she nor Defendant had on clothes. B.B. testified that she knew the sexual abuse occurred at least eight times but that those three incidents "just stuck out to [her]." She explained that the abuse always occurred in Defendant's bedroom when Co-Defendant Robinson was not around. She estimated that the incidents where Defendant checked her breasts and vagina occurred "every other month" after she turned ten or eleven. B.B. said that Defendant told her the reason he was checking her vagina was to "make sure [she] was clean." She explained that, when Defendant decided she was not clean, he would "beat" her. B.B. stated that Defendant began regularly touching her vagina around age ten or eleven and that Defendant's conduct continued until she left Defendant's home. B.B. said that the only person she discussed the abuse with was K.B. B.B. testified that she did not talk to her mother about

the sexual abuse during the times she was able to sneak in a phone call to her mother. She said that Defendant also kissed her on the lips.

B.B. testified that she left Defendant's home after the incident in which Defendant whipped K.B. with a belt. She recalled seeing bruises all over K.B.'s body and face, and she noticed that K.B.'s face was swollen after the incident. B.B. testified that her sister's nose was bleeding and that she had "dried up blood on her face." B.B. testified that, after they were removed from Defendant's home, she and her siblings lived with Co-Defendant Robinson's mother for three weeks. She agreed that, during a forensic interview, she denied that anyone touched her inappropriately. B.B. explained, "Well, at that time I wasn't talking to nobody because we [were] still living with Ms. [Dillard], and I didn't know where I was going or who I was living with. Plus I was scared to even talk because we could get in trouble for it." She agreed that, at the time, she believed that "that's just what dads do[.]"

B.B. said that she had not talked to her mother about the sexual abuse prior to March 21, 2012. She said that she first spoke to her mother after her mother picked up B.B. and her siblings from DCS. B.B. recalled:

> [W]ell, the forensic place had sent my mom a copy of everything that was said and everything that was going on. And my mama came to me and asked me, and I was open -- I just opened up to her because I knew I wasn't going back. So that's when I just started talking to her.

B.B. acknowledged that her mother was less strict than Defendant and Co-Defendant Robinson. She said that, after returning to live with her mother, she stopped going to school because she was being picked on but stated that her mother believed she was still attending because she "was catching the bus." B.B. denied that her mother ever told her to make up the allegations of sexual abuse and said that she had not spoken to her mother for "a while" before the disclosure.

On cross-examination, B.B. testified that she left Defendant's home when she was in the eighth grade. She agreed that she sent Co-Defendant Robinson a friend request on Facebook after returning to live with her mother. She agreed that she contacted Co-Defendant Robinson through email and told Co-Defendant Robinson, "[E]ven though I don't live with you anymore you will always be my mother, you taught me everything." B.B. acknowledged that she stated in a Facebook conversation that she wished she had her "old family back" and that she missed "everybody[.]" B.B. explained:

> And that was when I first got back with [my mother.] That was October. After October, you don't see any more messages. Me and my

mom was [sic] on a bad note. All I knew was them and their people. That's all I knew for eight years was them.

B.B. testified that, when she was first interviewed after leaving Defendant's home, she made no mention of being sexually abused. B.B. recalled that she told Jill Howlett at Our Kids that Defendant would touch her vagina when she would get out of the shower. She stated that her mother learned about the abuse after B.B. spoke to Ms. Howlett. B.B. said that she did not tell her mother anything about the sexual abuse but that her mother "read the papers" and confronted her about the allegations. She agreed that she spoke to her mother about Defendant's sexual abuse before she made the allegations to DCS. B.B. said that she spoke to K.B. about the abuse while they were still living with Defendant.

B.B. agreed that the defendants did not allow her to have a cell phone and that her mother allowed her to "do more on Facebook[.]" B.B. stated that she was dating someone within three months of leaving Defendant's home but explained that she was dating "when [she] was staying with [the defendants], too . . . [but] [t]hey didn't know." She acknowledged that K.B. was also allowed to date after leaving Defendant's home.

On redirect examination, B.B. stated that she did not disclose that she had been touched inappropriately during her first interview because she was scared and "didn't know who [she] was going back with at the time." She said, "I didn't know I was going back with [my mother]. If I did know I was going back, I would have talked like I am now." B.B. was asked when she realized that Defendant's touching may have been wrong, and she replied, "When they had sent the packet through the mail with us talking to the lady, and my mama had broke [sic] down crying and she had asked [K.B.] about the tampon[.]"

Carrie Donnell testified that she was a pediatric nurse practitioner and full-time member of the Child Abuse Response and Evaluation team at Vanderbilt University Medical Center. Ms. Donnell recalled that, on March 16, 2012, Ms. Leeman with DCS asked her to examine K.B. She spoke briefly to K.B. to obtain her medical history and to discuss her injuries in greater detail. K.B. told Ms. Donnell that, two days prior, Co-Defendant Robinson "started beating [her]" and used her fists to hit K.B. in the face and "all over[.]" K.B. said that Co-Defendant Robinson then instructed her to take off all of her clothes and go upstairs to see Defendant. Defendant then "whooped her with a belt" and began "beating [her] with his fists . . . all over." K.B. did not make any allegations of sexual abuse at that point. When Ms. Donnell asked K.B. about whether she felt safe at home, K.B. expressed fear of returning home and said she would run away.

Ms. Donnell testified that she then performed a physical examination of K.B. She noted tenderness to K.B.'s nose and multiple bruises all over her body. Ms. Donnell

stated that, in her professional opinion, the injuries to K.B. were consistent with having been hit by a folded belt. She said that the injuries were not self-inflicted. Ms. Donnell explained that she next asked a "screening question" about whether K.B. had been touched "down there in that region." K.B. responded that Defendant touched her to "make sure she [was] clean . . . and so she [knew] where her clitoris [was] located." K.B. also told Ms. Donnell that Defendant touched her breasts because they were different sizes. K.B. stated that Defendant had touched her with his hands on more than one occasion and that he had last checked her breasts a week prior.

Ms. Donnell explained that she conducted an external examination of K.B.'s genitalia looking for any injuries. Ms. Donnell did not see any obvious bruising or injury; she explained, however, that this finding did not rule out sexual abuse. Ms. Donnell explained that she made a referral to Our Kids Center based on K.B.'s disclosure. She stated that Our Kids had expertise in evaluating and providing medical evaluations for children with concerns of child sexual abuse. Ms. Donnell explained that she also notified her supervisor and Ms. Leeman of K.B.'s disclosure. Ms. Donnell said that K.B.'s mother was not present for K.B.'s examination. On cross-examination, Ms. Donnell stated that K.B. did not give "express details" regarding the sexual abuse.

Jill Howlett, a forensic social worker, testified that she was employed at Our Kids Center, an outpatient clinic of Nashville General Hospital. She stated that she conducted forensic medical evaluations when there were concerns of child sex abuse. Ms. Howlett stated that on June 26, 2012, she met with B.B. at Our Kids. Ms. Howlett explained that B.B. was referred to Our Kids by Ms. Leeman, and she recalled that B.B. was brought to the center by her mother. Ms. Howlett testified that she first obtained a medical history from B.B. She said that she asked mostly open-ended questions and some direct questions. Ms. Howlett testified about her conversation with B.B., as follows:

> [B.B.] described that [Defendant] would check her vagina when she got out of the bath or shower -- I'm not sure which word she used -- and that he would open up her vagina to make sure everything was okay. She also described that he would examine her breasts, and she used two fingers to kind of push on her own breast tissue, that he would do breast exams on her. She described that as to make -- she thought it was to make sure she was developing appropriately. I asked her specifically if he ever put his mouth anywhere on her body or she ever had to put her mouth on his body, and she said no. She also said that he would spank her butt but did not describe anything going inside.

Ms. Howlett explained that B.B. said it happened more than one time but not every time she got out of the shower. Ms. Howlett then explained the physical exam to

- 15 -

B.B.; however, B.B. said that she did not want to have the exam done. Ms. Howlett stated that Our Kids did not force children to undergo a genital examination and that, based on the incidents described by B.B., "her risk for injury and infection was very low."

Defendant's Proof

Janell Glover testified that she was employed at Smithson Craighead Academy Project Reflect Incorporated, Tennessee's first charter school. Ms. Glover stated that, in 2006, K.B. and B.B. were attending the school and having a difficult time there. She explained that they were in the custody of their mother at the time and were often absent from school. Ms. Glover testified, however, that when K.B. and B.B. went into the custody of the defendants, their academic performance, behavior, and attitude improved greatly. Ms. Robinson stated that K.B. and B.B. attended the school from kindergarten through fourth grade.

Peter Streiff, an employee of DCS, testified that there was a custody disagreement between the victims' mother and the defendants regarding K.B. and B.B. He recalled that, when the victims' mother attempted to regain custody of her children, he conducted home studies of both homes. He stated that, during one court proceeding relating to the custody dispute, the victims' mother tested positive for drug use.

Jennifer Leeman testified that she was employed as a caseworker by DCS and that she was involved in the investigation into the allegations of sexual abuse against Defendant. Ms. Leeman recalled that she watched K.B.'s forensic interview and agreed that K.B. stated in the interview that Defendant "did not check her breasts that much[.]" She explained that K.B. and B.B. were placed with Ms. Dillard following the allegations but that Ms. Dillard asked that they be removed because they were being "disrespectful." Thereafter, K.B., B.B., and their siblings were sent to live with their mother. Ms. Leeman recalled that she provided "some assistance" to the victims' mother with the transition of having five children placed in her home. She recalled that the victims' mother asked for financial help, including "food stamps and housing."

On cross-examination, Ms. Leeman recalled going to K.B.'s school on March 15, 2012, after the school notified DCS of K.B.'s injuries. Ms. Leeman stated that she saw injuries to K.B., including bruises on her arms and legs. She stated that the children were immediately removed from Defendant's home and placed with Ms. Dillard. Ms. Leeman said that she was not able to get in contact with the victims' mother at that time because she "did not have her contact information[.]" Due to her injuries, Ms. Leeman scheduled an appointment for K.B. at Vanderbilt Hospital for March 16, 2012, and she recalled that

- 16 -

Ms. Dillard took K.B. to the appointment. Ms. Leeman said that the victims' mother had not been contacted by that date.

After learning about the allegations of sexual abuse made by K.B. to Ms. Donnell, Ms. Leeman scheduled an appointment for K.B. at Nashville Children's Alliance, where a forensic interview was conducted. Ms. Leeman accompanied K.B. to the forensic interview, which was conducted March 21, 2012. Ms. Leeman said that the first time she had seen or spoken with the victims' mother was on March 26, 2012, when K.B., B.B., and their siblings were placed into her custody.

Shaska McBride testified that she worked for DCS and that, in 2014, she assessed the victims' mother's home after concerns were raised that she was leaving K.B. and B.B. unsupervised. She said that the victims' mother acted "more as a friend" than as a mother and "had no clue about how to parent her children[.]"

Veronica Stephens-Anderson testified that she had known Defendant and Co-Defendant Robinson for over twenty-five years and that they had attended church together. She stated that, in her opinion, Defendant and Co-Defendant Robinson were "very trustworthy" and that they had a "[v]ery good" reputation in the community.

Talicia Tyus testified that Co-Defendant Robinson was her cousin. Ms. Tyus explained that she had known Defendant for sixteen years, since she was four years old. She said that, between the ages of twelve and fifteen, she lived with the defendants. She stated that, based on her knowledge of Defendant, she did not believe he would sexually assault a young woman.

Ebony Stephens testified that she was twenty-five years old and that Defendant was her "god dad." She stated that, between the ages of twelve and seventeen, she saw Defendant often and attended church with him every Sunday. Ms. Stephens explained that she visited Defendant's home two to three times a week. She recalled that the defendants had K.B. and B.B. involved in the choir at church, in basketball, and in "a lot of different activities outside of the home." Based on her knowledge of Defendant, Ms. Stephens testified that she did not believe Defendant would be "inappropriate sexually with a young woman" and stated that she had not experienced that from Defendant.

Timothy Claybrooks testified that he worked for DCS and that he had contact with K.B. in 2013, when K.B. was placed in a foster home over the weekend based on her behavior at home with her mother. Mr. Claybrooks recalled that K.B.'s behavior was poor at the foster home too; the foster parent reported that K.B. would not follow rules or do anything asked of her.

- 17 -

Defendant testified that on March 14, 2012, he was upstairs lying in his bed when an altercation broke out between Co-Defendant Robinson and K.B. He said that both Co-Defendant Robinson and K.B. came into the bedroom to explain their side of what happened. Defendant learned that K.B. had lied about calling their neighbor, Ms. Moore, and he stated that she had called Ms. Moore without permission. Defendant stated that he decided K.B. needed a whipping because she hit Co-Defendant Robinson in the stomach. He explained that Co-Defendant Robinson was pregnant at the time. Defendant testified, "I just told [K.B.] to pull her pants down, lay on the bed, I went and got my belt, and I gave her several licks." He stated that K.B. had on underwear. Defendant agreed that the bruises to K.B. seen in photographs introduced by the State were caused by his hitting her with the belt. He claimed, however, that it was not his intent to cause the bruises. He said that K.B. was "grabbing for the belt and trying to take it out of [his] hands" and that she received the bruises while struggling during the whipping. Defendant denied ever striking K.B. in the face or nose. He said that her nose was not injured that day.

Defendant recalled that Co-Defendant Robinson took K.B. to juvenile detention after the whipping to show K.B. "this [was] where children that act up go and this [was] not where [she] want[ed] to end up." Defendant said that, when they returned home, K.B. cleaned the kitchen; Co-Defendant Robinson came upstairs to talk to him, and "everything went back to normal." K.B. finished her homework and went to bed.

Defendant denied ever touching K.B. or B.B. inappropriately. He said, "I have no idea where the term checking comes from. But when they would get out [of] the shower, they would still smell like they had a bag of onions in a headlock. And I would make them get back in the shower." He explained further, "They would come out in their pajamas, and you could smell their arms and their vagina through their clothes." He said that both K.B. and B.B. came to him and Co-Defendant Robinson complaining of "discharges" and that their doctor told Co-Defendant Robinson "it was because they were not cleaning themselves properly." Defendant agreed that K.B.'s breasts "weren't developing evenly" and said that they took her to the doctor about this issue.

Defendant stated that K.B. and B.B. were "doing excellent" while living with him and Co-Defendant Robinson. He recalled that they went to school daily, were involved at church, that K.B. played softball and basketball, and that B.B. was a cheerleader. Defendant stated that, when he observed the victims' behavior during their testimony, he leaned over and told trial counsel that "when they start acting like that they're lying." Defendant explained, "They get nervous, they do the crying, the whole bit. And they want people to feel sorry for them. So when they act like that, they're lying."

On cross-examination, Defendant stated that K.B. and B.B. moved into his home in 2003, when they were six years old. He agreed that, during the eight years they lived

with him, K.B. and B.B. rarely saw their mother. He said that the victims' mother only tried to regain custody of them one time, in 2006. He said that he gave K.B. a spanking on March 14, 2012, because she hit Co-Defendant Robinson in the stomach. Defendant admitted that there were times when he was at home with the victims when Co-Defendant Robinson was not there.

Co-Defendant Robinson testified that neither she nor Defendant ever sexually abused K.B. or B.B. Co-Defendant Robinson explained that she first met the victims' mother while working as the director of a daycare where the victims' mother was employed. Co-Defendant Robinson stated that she had owned the own daycare facility for sixteen years and that there had never been any complaints against her for sexually abusing children. She recalled that the victims' mother felt she was unable to care for her five children and, initially, asked the defendants to take care of the three youngest children for a short time. The defendants agreed to help the victims' mother, and they completed a power of attorney for the children's medical and school needs. Co-Defendant Robinson recalled that, after about a year, the victims' mother asked the defendants to take the two older children, K.B. and B.B., and Co-Defendant Robinson realized that the arrangement was going to be long-term.

Co-Defendant Robinson testified that the victims' mother attempted to regain custody of the children in 2006, after Co-Defendant Robinson confronted her about how she was still receiving benefits for the children. Five hours later, the victims' mother was at Defendant's home with the police attempting to take back the children. The victims' mother later took the matter to juvenile court, but the defendants were awarded custody of the children.

Co-Defendant Robinson stated that the children behaved "badly" when they first came into the defendants' custody. However, their behavior and school performance improved greatly while living with the defendants. Co-Defendant Robinson said that she and Defendant made sure that the children got an education and that they were involved in extracurricular activities. She recalled that, around 2012, K.B. began getting in trouble at school. Additionally, Co-Defendant Robinson became pregnant with her second child at that time, and she "felt a little distance" between her and K.B. Co-Defendant Robinson said that K.B. and B.B. never expressed that they would prefer to live with their mother. Co-Defendant Robinson stated that, during the years that K.B. and B.B. lived in her home, she regularly took them to a pediatrician. She agreed that the girls had "some issue with discharge" and were taken to see their doctor to address the issue. She said that both she and Defendant made sure that the girls showered properly.

Regarding the confrontation on March 14, 2012, Co-Defendant Robinson explained that Ms. Moore came over to pick up K.B to go to church. Co-Defendant

Robinson said that K.B. lied to Ms. Moore and then lied when Co-Defendant Robinson confronted her. When K.B. finally admitted that she had called Ms. Moore from school because she did not want to go to a program at the defendants' church, Co-Defendant Robinson told her that she could not help a neighbor that weekend as they had previously planned. K.B. got upset and began yelling. She then "elbowed" Co-Defendant Robinson in the stomach and "stormed upstairs." After Co-Defendant Robinson told Defendant what happened, he said that K.B. was "going to get a whooping." Co-Defendant Robinson stated that neither she nor Defendant punched K.B. in the face. Defendant told K.B. to pull her pants down. Co-Defendant Robinson testified that K.B. pulled down both her pants and underwear, and Defendant had her bend over so that she could "get her whooping." Co-Defendant Robinson recalled that K.B. struggled and attempted to grab the belt used by Defendant. She said that Defendant hit K.B. four times. Afterwards, Co-Defendant Robinson drove K.B. to juvenile detention and explained that was where children were sent who lied and were disrespectful.

On cross-examination, Co-Defendant Robinson stated that she had never discussed the criminal case with Defendant, even though they were still married and lived in the same house. She claimed that, in the eight years that K.B. and B.B. lived in her home, Defendant was never alone with them. Co-Defendant Robinson said that she had never seen the children get a whipping because they were not clean. She stated that Defendant never told her that "he could smell their vaginas" when K.B. and B.B. got out of the shower. She reiterated that neither K.B. nor B.B. expressed to her a desire live with their mother.

At the close of proof, Defendant made a motion for judgment of acquittal, which the trial court granted as to some counts. The State then made an election of offenses.

Closing Argument

During Defendant's closing argument, trial counsel stated, "We're going to talk about the possible motives in this case in a minute. You've already heard them. We don't have to prove motive, but it's always kind of nice to know why someone might make allegations." He noted that K.B. and B.B. "were yanked away from their biological mother at the age of five . . . [y]ou can only imagine how that felt, but no one addresse[d] it." Trial counsel continued:

> And even professionals, it's just the last five or ten years they're realizing, you know, the amount of therapy that children in that situation need and what to do for them. [K.B. and B.B.] didn't get the therapy they needed. So they were yanked away from their biological mother. And as [K.B.] testified, she never wanted to go and she always wanted to go back

and live with her mother.  So while the [defendants] are doing the best that they can as parents, as foster parents for these children, I would submit to you that those emotional bonds are not forming for [K.B.] and [B.B.]

Trial counsel argued that, after the whipping, K.B. was angry and did not want to go back to Defendant's home.  He noted that Ms. Donnell, who conducted the original physical examination of K.B., "with no medical history to suggest anything happened . . . says, well, by the way, has anybody touched you down there[.]"  He argued that K.B. made the allegation that Defendant touched her inappropriately to ensure that she did not have to go back to live in Defendant's home.  Trial counsel argued that B.B. maintained for several months that she was not touched sexually but that,

all the sudden after her mother speaks to her[,] she changes her story.  I think you saw from the demeanor in the courtroom that these girls are going to stick together whichever way they decide to go.  So finally [K.B.] got [B.B.] on board with this story.  . . . And that, ladies and gentlemen, ensured they were never going back to the [defendants].

Trial counsel additionally argued that the victims were not credible and pointed out inconsistencies in the testimony.

In its final closing argument, the State addressed trial counsel's assertion in opening statement that the victims' mother instigated the allegations of sexual abuse.  The prosecutor argued:

I want to start with what you were told by [trial counsel] when this case began.  You were told that the sexual assault allegations were initiated and started by [the victims' mother] in order to gain custody.  You were told that there was no allegation of sexual abuse that occurred until [the victims' mother] was in the picture.  You were told that [the victims' mother] and DCS swooped in to get these twins away from the [defendants].  What did the evidence actually show, ladies and gentlemen?  [The victims' mother] was nowhere to be found in March of 2012 when this whipping occurred.  [The victims' mother] was not present when [K.B.] was examined by [Ms.] Donnell, the pediatric nurse practitioner.  [Ms.] Leeman didn't even have any contact information for her.  Neither [K.B.] nor [B.B.] had talked to [the victims' mother] in the months prior to March 2012, hadn't even talked to her.  They hadn't lived with her since they were six-years old.

- 21 -

The State then addressed additional motives to lie raised by the defense, including the victims' desire to live with their mother, the "too strict" home life that the victims had with the defendants, and K.B.'s wanting to "get the [defendants] back after receiving the whipping." The prosecutor concluded by arguing that Defendant's own testimony, and the inconsistent and incredible testimony from Co-Defendant Robinson, supported a conclusion that the victims were telling the truth about Defendant's sexual abuse.

Following deliberations, the jury found Defendant guilty of five counts of aggravated sexual battery, four counts of rape of a child, two counts of sexual battery by an authority figure, two counts of rape, and one count of attempted rape of a child.

## Sentencing

Following a sentencing hearing, the trial court imposed the following sentences:

| Renumbered Count | Conviction Offense | Classification | Sentence |
|---|---|---|---|
| 1 | Aggravated Sexual Battery | Class B felony | 10 years at 100% |
| 2 | Aggravated Sexual Battery | Class B felony | 10 years at 100% |
| 3 | Aggravated Sexual Battery | Class B felony | 10 years at 100% |
| 4 | Attempted Rape of a Child | Class B felony | 10 years at 100% |
| 5 | Rape of a Child | Class A felony | 30 years at 100% |
| 6 | Rape of a Child | Class A felony | 20 years at 100% |
| 7 | Sexual Battery by an Authority Figure | Class C felony | 5 years at 30% |
| 10 | Rape | Class B felony | 10 years at 100% |
| 13 | Aggravated Sexual Battery | Class B felony | 10 years at 100% |
| 14 | Aggravated Sexual Battery | Class B felony | 10 years at 100% |
| 16 | Rape of a Child | Class A felony | 20 years at 100% |

| 17 | Rape of a Child | Class A felony | 20 years at 100% |
|----|----------------|----------------|------------------|
| 19 | Sexual Battery by an Authority Figure | Class C felony | 5 years at 30% |
| 22 | Rape | Class B felony | 10 years at 100% |

The trial court ordered Counts 1-4 to run concurrently. The court further ordered Counts 5-7 to run concurrently to each other but consecutively to Counts 1-4. The trial court ordered Counts 16-17 to run concurrently to each other but consecutively to Counts 5 and 6. All other counts were ordered to run concurrently, for a total effective sentence of sixty years' incarceration.

Defendant filed a timely motion for a new trial and a motion for trial counsel to withdraw. Defendant then filed an amended motion for new trial, asserting numerous claims including that he was denied the effective assistance of counsel.

**Motion for New Trial Hearing/Post-Conviction Hearing**

At a hearing, Ronald Nollner testified that the worked for the state trial courts as a jury coordinator. Mr. Nollner explained that he summoned jurors each week when trials were scheduled. He stated that Defendant's trial began on February 6, 2017, and that there were four jury trials held that day in Davidson County. Mr. Nollner said that a trial began in Judge Watkins' courtroom at 9:16 a.m.; the trial in Judge Norman's courtroom began at 9:26 a.m.; Defendant's trial in Judge Blackburn's courtroom began at 9:53 a.m.; and Judge McClenden's trial started at 10:32 a.m. He explained that all of the summoned jurors were sent to one of those four courtrooms that morning. He stated that one juror, Mr. Sparks, checked in at 8:04 a.m. and was sent to the panel in Judge Blackburn's courtroom at 9:53 a.m. Mr. Sparks returned to the jury assembly room at 10:41 a.m. Thereafter, Mr. Sparks and other jurors were told to return the following day for a trial set to start in Judge Wyatt's courtroom. Mr. Nollner stated that Mr. Sparks checked out at 11:59 a.m. Mr. Nollner testified that the jury in Defendant's case was the last to be selected, at approximately 3:00 p.m. He stated that, if Judge Blackburn had contacted him on February 6 around the time that Mr. Sparks had been sent back to the jury assembly room and had requested a new panel of thirty to forty jurors that had not been in the initial group, Mr. Nollner would have been able to fulfill her request.

K.B. testified that she did not recall telling B.B., when the allegations of sexual abuse first came to light, that she was going to "get even" with Defendant and Co-Defendant Robinson. She agreed that she continued to go to the same church as the

defendants for a few weeks after being taken out of their home. She said that she did not recall talking to anyone at the church and mentioning "getting even" with the defendants.

B.B., who also testified at the hearing, denied that K.B. ever said that she was going to "get even" with the defendants. She did not recall continuing to attend the same church as the defendants after being removed from their home. She denied telling anyone at church that K.B. said she was going to get even with Defendant and Co-Defendant Robinson.

Co-Defendant Robinson testified that she pled guilty in August 2017 to assault and received a sentence of six years' probation. Co-Defendant Robinson said that, after the victims had been removed from her home, she was in church with the victims, and B.B. told her that K.B. said she was "paying [them] back[.]" Co-Defendant Robinson said that her conversation with B.B. occurred right after the notification from the school, so Co-Defendant Robinson "related it to what the school told us the complaint was." She said that she told trial counsel about her conversation with B.B.

Trial counsel testified that he had practiced law for thirty-one years and had started his own practice as a criminal defense attorney in 1995. He said that he had tried at least 200 jury trials. He said that he was hired to represent Defendant shortly after Defendant's arrest in 2012. Trial counsel said that, by the time of trial, Defendant's case had been pending for about four years and that it had been his longest ongoing open case. Trial counsel testified that there had been many motions, hearings, and issues with discovery and stated that the case was one of the most complex he had tried in terms of evidentiary issues.

Trial counsel explained that he filed a motion to sever the physical abuse allegation from the sexual abuse allegations, which was granted by the trial court. He recalled that Defendant was tried first on the severed charge of aggravated child abuse. He agreed that many of the issues and defenses involved in the first trial overlapped "to a significant degree" with the remaining charges. He stated, however, that the main theory of defense in the aggravated child abuse case was to admit that Defendant hit K.B. with a belt but deny that K.B.'s injuries rose to the level of serious bodily injury. Trial counsel testified that he never attacked the motive of the victims in the first case. In the second case, the defense theory was that Defendant denied the allegations of sexual abuse, and trial counsel was "looking for a motive to explain why the allegations would've been made if they were false."

Trial counsel said that he put the records used in the first trial into storage after trial. He explained that he packed up what he thought was

just the documents, reports, everything dealing with the physical abuse and just kind of put that in a box and put it away in storage and forgot about it. And that included Ms. Donnell's report, and that report dealt with the physical abuse but also contained her statements of . . . [K.B.] making the first allegation of sexual abuse to Ms. Donnell.

He stated that, before the second trial, he did not look at Ms. Donnell's report again.

Regarding his preparation for the second trial, trial counsel stated that he began preparing both cases for trial before the first trial started. He explained, however, that because the defenses were different, he focused on different things in preparing for the first trial. He said that, after the first trial was concluded, he prepared for cross-examination for in the second case. He testified that he had opened the file and had prepared for trial in the sexual abuse case "a number of times" and that "trial preparations were done multiple times because this case had been continued multiple times[.]" He admitted that he opened the file to prepare for the second trial much later than he normally would have because he had done "everything previously[.]" He said that he went through the file to refresh his memory and to see "if there was anything [he] could do better."

Trial counsel stated that, on the Saturday morning before trial, he went to his office and began reviewing things for trial. He stated that he decided to prepare a timeline of important events in the case. He stated that he prepared the timeline using rough notes he had made. Trial counsel said that he began to feel ill, and he was frustrated with his attempts to create a timeline using PowerPoint. By early Saturday evening, trial counsel was "feeling very sick, nauseous, [and had a] severe headache." He had to lie down in his office for several hours before he had been able to drive home. Trial counsel stated, "I remember thinking there's no way I'll be trying a case on Monday, I'll probably be calling in on Monday morning to the court."

Trial counsel testified that he eventually created a timeline using an Excel spreadsheet with "colors and dates and events[.]" Trial counsel agreed that, when he made the spreadsheet, he did not recall the March 16, 2012 report from Ms. Donnell and explained that he did not have the report in his active file. He explained, "Whatever happened, I just completely forgot and was unaware of that initial allegation being made to Ms. Donnell." As a result, K.B.'s initial disclosure of sexual abuse to Ms. Donnell did not make it into the timeline. According to trial counsel's timeline, the first allegation of sexual abuse occurred on April 1, 2012, after the victim's mother regained custody, when the victims' mother informed DCS that B.B. was claiming sexual abuse. Based on the timeline that he developed, trial counsel asserted that the victims' mother was behind the sexual abuse disclosures because they did not arise until the mother was "back in the

picture[.]" Trial counsel testified that, from the beginning, it was the defense theory that the victims' mother "had something to do with this." He said:

> What we could never really do, you know, is prove a conversation or even a meeting between [the victims' mother] and the [victims] prior to them, prior to the date [K.B.] went to school with the bruises. So while our theory was that [the victims' mother] probably had something to do with it, we didn't have this smoking gun, so to speak, of a meeting between [the victims' mother] and the [victims] before DCS was called about the physical abuse.

When he put together his timeline, trial counsel noticed that there was no allegation of sexual abuse until after the victims' mother had contact with the victims. Trial counsel said that he "felt that was clearly supportive of our theory." Trial counsel agreed that he had not previously seen anything to show "recent contact" between the victims' mother and the victims. He said that, before the examination by Ms. Donnell, "there may have been some phone calls, but nothing very recent."

The following exchange then occurred:

> Q. Is it fair to say that the [Ms.] Donnell report on March 16, 2012, effectively made the defense that the birth mother was behind the allegations impossible?
>
> A. I wouldn't agree that it was impossible, but it certainly made it more difficult and it certainly was directly contradictory to what I told the jury.

Trial counsel testified that, by Sunday afternoon, he was feeling "well enough to sit up, get up, [and] walk around a little bit." He said that because he had prepared the case for trial numerous times, he felt that he was ready and did not really need to do any work on Sunday. He woke up Monday morning "not feeling great but . . . felt like, yeah, I'm good to go, I can do this." He did not recall telling Defendant about his illness or that he might need to continue the trial. He stated that he advised the jury he had "a little bug" because his voice was raspy. Trial counsel said that he wondered if his illness contributed to his missing Ms. Donnell's report. He stated that he was able to function during the trial but that, in hindsight, he felt that "there were certain parts of the trial that [he] let get out of control[.]" Trial counsel felt that he let the testimony delve too far into the physical abuse allegation. He recalled sitting at the defense table and thinking "how did I let this get . . . to the point where so much of the details of this physical abuse situation ended up being testified to, how did this happen[?]" Trial counsel agreed that

- 26 -

the trial court had issued some pretrial orders on the extent to which the parties could offer evidence of the physical abuse in the second trial.

Trial counsel stated that he first realized that he made a mistake as to the timeline of events early in the trial at a bench conference when the prosecutor mentioned it to the trial court. He said that he had an "oh crap moment" and that the only thing he could think to do was to try to explain to the jury in closing argument that "look, I made a mistake, don't hold that against [Defendant]." However, trial counsel said that he decided not to mention the mistake during closing; he said that he hoped the State would not use the mistake in its final closing argument, and he hoped that the jury would realize it was not intentional. Trial counsel testified that, in his opinion, his telling the jury that the victims' mother planted the idea of sexual abuse in the minds of the victims was ineffective assistance of counsel. He said that it was a "major point" regarding the central theory of Defendant's case. He said, "If you do something that the jury is going to find not credible as a lawyer, I think that's going to rub off on your client."

Trial counsel recalled that Co-Defendant Robinson overheard a conversation in which one of the victims said that "she was going to get even." He stated that he meant to ask K.B. and B.B. about this during cross-examination, but he failed to do so. He recalled that, when he asked Co-Defendant Robinson about the statement, the State objected because he had not asked K.B. or B.B. about it. Trial counsel stated that his response to the State's objection should have been that he was offering the statement as evidence of the declarant's state of mind, not as impeachment. He stated that it showed the victim was upset and angry.

Trial counsel recalled that, during voir dire, Mr. Sparks said that he had been a grand juror and that, in his experience, "everybody who gets indicted is guilty[.]" After Mr. Sparks was excused, trial counsel asked that the trial court inform the potential jurors that the grand jury does not hear all of the evidence. Trial counsel said that he should have asked the trial court to instruct that the standard for an indictment was probable cause rather than proof beyond a reasonable doubt. He said that there was not a strategic reason that he did not ask for that instruction; he just did not think of it at that exact moment.

Trial counsel testified that it was "completely improper to allow the [S]tate to just restate, to rephrase prior witness testimony and ask [Defendant] if he had heard that testimony; so [he] made objections." He testified that the State's questioning of Defendant in this manner spanned ten pages of the trial transcript. Trial counsel agreed that he attempted to limit the testimony about the physical abuse—both in a pretrial motion and during trial. He said, "I mean I will say this somewhat in my defense. It was a pretty fine line we were trying to walk because there was an agreement that, all right,

some of it was fair game because of the whole motive issue[,]" referring to the defense theory that the victims were motivated to make up the allegations of sexual abuse because "they were getting beatings." Trial counsel understood that the trial court was going to allow some of the evidence about the whipping but said that it "got way farther into that than what should have been allowed." He said that he failed to "keep a lid on it" and acknowledged that there was no strategic reason for not objecting.

Trial counsel stated that the defense theory was two-prong: the theory was that the victims' mother may have instigated the allegations and "also, even more so, was the theory . . . that the [defendants] were very strict and would not let the kids do what they wanted, and that when the kids got to go live with their biological mother . . . they pretty much had free reign, go to do whatever they wanted." Trial counsel recalled a statement he found in the DCS records where K.B. "told the caseworker that she [became] violent when she [didn't] get her way." Trial counsel asserted that he should have been able to present the statement as it was relevant and important to the defense. He argued that, if K.B. became violent, "[was] it that much harder to believe that she would make a false allegation of sexual abuse."

Trial counsel agreed that he attempted to subpoena housing and benefit records relating to the victims' mother. He said that, as soon as the children were returned to their mother's custody, she was "back asking DCS and the government for financial assistance of the children." He agreed that one of the reasons the trial court denied the subpoena was that he filed the request too close to trial. He explained that he focused on this issue "late in the ball game" and that he did not think about requesting the records until about a month before trial. Trial counsel stated that he believed the records would have been "some additional evidence in support of our theory that . . . [the victims' mother is] just wanting the kids back, and maybe initiated or cause the initial of these sexual abuse allegations because that gets her the kids back and . . . gets her financial aid."

Trial counsel stated that, if a trial judge is unnecessarily hostile toward one party for no reason, "it does create a great deal of concern for the jury and is going to cause a great deal of concern for the jury about the lawyer's credibility and thus his client's credibility." He said that he believed the trial court was hostile to the defense in this case. Trial counsel concluded that he did not believe Defendant received a fair trial due to his performance.

On cross-examination, trial counsel admitted that the theory that the victims' mother influenced the victims' allegations was not the only theory he pursued at trial. He stated that additional defense theories included that the victims made the allegations because of K.B.'s whipping. Another theory the defense pursued was that the victims

- 28 -

wanted to go live with their mother because Defendant and Co-Defendant Robinson were "ultra[-]strict on them[.]" Trial counsel said that it was his theory that, regardless of when the information came out about the sexual abuse, that the victims' mother was still influencing the victims to make these allegations "so she could get custody for the benefits." Trial counsel recalled that, during his cross-examination of K.B., K.B. admitted that she had talked to her mother some time before she made the allegations. He agreed that K.B. admitted to talking to her mother and telling her mother about receiving beatings from the defendants. Trial counsel agreed that the theory that the victims' mother planted the allegation was not the sole defense. Trial counsel testified, "[O]ur central theme was their motive was they wanted to go live with their mother . . . and, therefore, made the false allegations."

Trial counsel stated that, if he had felt he could not proceed to trial due to his illness, he would have requested a continuance. He said that he felt like he could do it. He acknowledged, however, that he "dropped the ball" by making a material misrepresentation to the jury and by allowing the State to present too much evidence about the physical abuse. Trial counsel said that he felt physically drained and had a lack of energy and focus during the trial.

Trial counsel stated that it was a strategic decision not to request a mistrial when Mr. Sparks made the statement about the grand jury. He explained that the answers he was receiving from jurors on the panel were "exceptionally good," and he thought, "I love this panel." Trial counsel agreed that he asked for a curative instruction from the trial court, and both sides discussed the State's burden of proof during voir dire. Trial counsel testified that a fair representation of the State's questions to Defendant were "asking [Defendant] to respond or to admit or deny the allegations that the victims were making." He agreed that the issue of the physical abuse—and the extent to which it was admissible—was litigated before trial, and the trial court issued an order about the parameters. Trial counsel recalled that he did ask K.B. about her using the bruises to get the defendants "in trouble."

At the conclusion of the hearing, the trial court took the matter under advisement. The trial court then denied the motion for new trial in a lengthy written order. This timely appeal follows.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his convictions. He asserts that "the weight of the evidence simply did not support the guilty verdicts[,]"

arguing that the victims' accounts of how often the abuse occurred varied considerably and that the victims were impeached several times by direct contradictions. He further argues that many of the victims' claims were produced by "overtly leading questions, rather than independent recollection[,]" that the victims' explanation for not reporting the abuse sooner does not "make sense[,]" that B.B.'s actions after leaving Defendant's home were inconsistent with claims of abuse, and that the victims had a motive to lie.

The State responds that the evidence overwhelmingly supports Defendant's convictions. The State contends that the victims provided consistent accounts regarding the substance of the abuse and that the fact that dates were difficult for them to parse out did not undermine their testimony when considering that there was repeated abuse over the course of several years. The State further argues that the credibility of witnesses is for the jury to determine, and the jury clearly accredited the victims.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

### 1. Aggravated Sexual Battery

Defendant was convicted of five counts of aggravated sexual battery. As charged here, aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim when the victim was less than thirteen years of age. Tenn. Code Ann. § 39-13-504(a)(4) (2011). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or

any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6) (2011).

K.B. said that Defendant began touching her when she was ten years old, when her "breasts were developing." She recalled that she was in Defendant's bedroom in the home on Woodview Circle when Defendant first touched her breasts. She stated that Defendant called her into his room to have a talk about "her growing into a lady[.]" She took off her shirt, and Defendant touched her breasts and talked to her about them. K.B. testified that, the next time she could recall Defendant fondling her breasts, they were living in the house on Ewingdale Drive, and she was about twelve years old. K.B. recalled that she knocked on the door to Defendant's bedroom and entered the room. She told Defendant that she "couldn't feel [her] nipple[.]" Defendant told her to take off her bra, and Defendant began touching her breasts. He then "put his mouth on [her] nipple to see if [she] could feel it." Finally, K.B. testified that, between the ages of ten and twelve, Defendant touched her breasts at least twice a week in his bedroom. She said that sometimes Defendant called her into his bedroom to check her breasts and that sometimes she told Defendant that she was "having problems" with them. K.B. recalled that Defendant made her lay on top of him while he was naked underneath his bed covers, and she said that Defendant kissed her on the mouth and attempted to put his tongue in her mouth.

B.B. testified about an incident that occurred when she was ten or eleven. She said, "I was more developed at the top, so that's when he . . . said the doctor said to check them like that, so that's how he was checking my breasts like that." She said that Defendant told her he was checking her breasts for "lumps[.]" B.B. further testified that, between the ages of ten and twelve, Defendant touched her breasts on more than one occasion. She said that the touching always occurred in the same manner in Defendant's bedroom and that he touched her vagina at the same time. B.B. also stated that Defendant kissed her inappropriately on the mouth. The victims' testimony is sufficient for any rational trier of fact to find Defendant guilty of five counts of aggravated sexual battery beyond a reasonable doubt.

### 2. Rape of a Child and Attempted Rape of a Child

The jury also found Defendant guilty of four counts of rape of a child and one count of attempted rape of a child. Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2011). "Sexual penetration" is defined as: "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part

of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2011). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2011).

Here, K.B. recalled that, the first time Defendant touched her vagina, she was eleven years old. She said that she got out of the shower "too fast[,]" and Defendant instructed her to lie on his bed and open her legs "wide open." K.B. stated that Defendant checked her vagina by using his two fingers to spread open her labia. K.B. testified that, the second time Defendant touched her vagina, she was twelve-years old. K.B. explained, "We [were] having a conversation about sex, and he asked me did I know where my cherry was. And I told him no." K.B. said that she took off her pajama pants and underwear off and lay down on Defendant's bed. He then inserted his finger into her vagina to show K.B. where her "cherry" was located. K.B. also testified that, between the ages of eleven and twelve, Defendant regularly checked her vagina by using his fingers to open the labia and move his fingers around the creases. She recalled that Defendant began touching her clitoris as a part of this process when she was about twelve years old.

B.B. testified that, when she was ten or eleven years old after she took a shower, Defendant checked her vagina by using two fingers to spread open her vagina, and he rubbed her clitoris with his middle finger. B.B. also testified that, between the ages of ten and twelve, Defendant touched her vagina on more than one occasion. She said that Defendant would spread her labia and use his middle finger to rub her clitoris. B.B. stated that this would occur in Defendant's bedroom and that Defendant would fondle her breasts at the same time. Based on this testimony, a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of four counts of rape of a child and one count of attempted rape of a child.

3. Rape

Defendant was also convicted of two counts of rape. As charged in this case, rape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim when force or coercion is used to accomplish the act. Tenn. Code Ann. § 39-13-503(a)(1) (2011). "Coercion," as relevant here, means "the use of parental, custodial, or official authority over a child less than fifteen (15) years of age[.]" Tenn. Code Ann. § 39-13-501(1) (2011).

In this case, K.B. testified that Defendant regularly checked her vagina, between the ages of ten and twelve, by using his fingers to open the labia. She said that Defendant would touch her clitoris and move his finger "around the creases." B.B. testified that Defendant touched her vagina on more than one occasion between the ages of twelve and thirteen. B.B. stated that Defendant would spread open her labia and use his middle finger to rub her clitoris. She recalled that this always occurred in his bedroom. It is undisputed that, during this time period, Defendant had custodial authority over K.B. and B.B. This evidence is sufficient to support Defendant's convictions for two counts of rape.

## 4. Sexual Battery by an Authority Figure

Finally, Defendant was convicted of two counts of sexual battery by an authority figure. As relevant to this case, sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant or the defendant by a victim when the victim was thirteen years of age or older but less than eighteen years of age at the time of the offense, and the defendant had parental or custodial authority over the victim at the time of the offense and used the authority to accomplish the sexual contact. Tenn. Code Ann. §§ 39-13-527(a)(1), (a)(3)(B) (2011).

In this case, K.B. testified that Defendant touched her breasts between the ages of thirteen and fourteen almost twice a week until she moved out of Defendant's home. Additionally, B.B. testified that, between the ages of thirteen and fourteen, Defendant touched her breasts on more than one occasion. B.B. stated that the touching occurred in Defendant's bedroom. Moreover, Defendant had custodial authority over the victims at the time of the offenses, and he used the authority to accomplish the sexual contact. The evidence is sufficient to support Defendant's convictions for two counts of sexual battery by an authority figure.

Defendant's arguments relating to the sufficiency of the evidence ultimately challenge the credibility of the victims. However, the credibility of witnesses, the weight of their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003). By its verdict, the jury clearly accredited the victims' testimony over that of Defendant and his witnesses, and this court will not reevaluate the evidence.

Defendant argues that the rule of cancellation applies "as a matter of law" to K.B.'s testimony, and accordingly, her testimony should be disregarded. In *State v. Matthews*, this court recognized that "contradictory [sworn] statements by a witness in connection with the same fact cancel each other." 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993) (citing *Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 482 (Tenn. Ct.

App. 1978)). The rule of cancellation applies only when inconsistency in a witness's testimony is unexplained and when neither version of the witness's testimony is corroborated by other evidence. *Id.* at 450 (citing *Taylor*, 573 S.W.2d at 483). A witness's testimony will only be disregarded if it "is not of a cogent and conclusive nature, and if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon." *Letner v. State*, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974) (internal quotation marks omitted). There is nothing about K.B.'s testimony that is so unreliable as to justify its exclusion; moreover, her testimony is corroborated in large part by B.B.'s testimony. Defendant is not entitled to relief on this claim.

## B. Ineffective Assistance of Counsel

In the next section of his brief, Defendant asserts that he was denied the effective assistance of counsel.[2] Defendant argues that trial counsel's performance was deficient for asserting in his opening statement that the allegations of sexual abuse were devised by the victims' mother to regain custody, when in fact the victims had no contact with their mother until after they disclosed the sexual abuse. Defendant contends that trial counsel's opening statement promised an "unprovable defense" and asserts that trial counsel's deficiencies "individually and collectively deprived [Defendant] of a fair trial."

The State responds that the victims had occasional contact with their mother prior to returning to her custody. Moreover, the State notes that trial counsel presented various defense theories and did not proceed solely on this theory. The State contends that the jury was presented with "ample evidence" regarding the victims' alleged motives to lie but that, ultimately, the victims provided detailed testimony regarding the abuse, which was "supported by visible bruises on K.B. from the beating that led to the disclosure of the other forms of abuse." The State argues, therefore, that Defendant has failed to establish that trial counsel's representation fell below an objective standard of reasonableness or that the outcome of the proceedings would have been different if counsel had not made this argument.

In order to prevail on a post-conviction claim, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such

---

[2] Defendant articulates one specific ground in support of the claim in this section of his brief and argues additional grounds in other sections. Accordingly, we will address the additional grounds supporting Defendant's claim of ineffective assistance of counsel in other sections of this opinion.

findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong

of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

We first note that the practice of raising ineffective assistance of counsel claims on direct appeal is "fraught with peril" since it "is virtually impossible to demonstrate prejudice as required" absent an evidentiary hearing. *Blackmon v. State*, 78 S.W.3d 322, 328 (Tenn. Crim. App. Nov. 16, 2001). Ineffective assistance can rarely be established without an evidentiary hearing, and if a defendant raises the issue on direct appeal, it may result in the defendant losing the appeal and also in barring him from raising the issue in post-conviction proceedings. *State v. Leroy Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *3 (Tenn. Crim. App. Jan. 12, 2007), *perm. app. denied* (Tenn. May 14, 2007). Instead, "ineffective assistance of counsel claims should normally be raised by petition for post-conviction relief." *State v. Derenzy Turner and Vernon West*, No. 02C01-9512-CR-00390, 1997 WL 312530, at *11 (Tenn. Crim. App. July 11, 1997), *perm. app. denied* (Tenn. Feb. 23, 1998). However, in this case, Defendant presented proof of his claims at the motion for new trial hearing with the assistance of counsel. As such, we will conduct a thorough review of his numerous claims of ineffective assistance of counsel.

In denying relief on this first claim, the trial court found that, throughout pretrial motion hearings and during his testimony at the motion for new trial, trial counsel "made clear the defense in this case was the [victims] were lying about the allegations." The trial court found that trial counsel "asserted multiple theories throughout the trial" as to why the victims would fabricate the allegations. The trial court determined that Defendant failed to establish deficient performance or resulting prejudice because trial counsel "consistently argued at trial the [victims] were lying about the allegations because they wanted to live with their mother."

We agree with the trial court that Defendant is not entitled to relief based on this claim of ineffective assistance of counsel. At the motion for new trial hearing, trial counsel acknowledged that he missed the March 16, 2012, report from Ms. Donnell during his preparation of his timeline prior to trial. Consequently, trial counsel asserted during opening statement that the defense intended to show that, prior to K.B.'s initial allegation of sexual abuse, the victims' mother "swoop[ed] in" and questioned K.B. about whether she had been sexually abused by Defendant, thereby potentially coaching the victims to make the sexual abuse allegations. However, trial counsel testified that the defense's "central theme was [the victims'] motive [that] they wanted to go live with their mother . . . and, therefore, made the false allegations." In his opening statement,

trial counsel asserted that K.B. and B.B. had various motives to fabricate the allegations of sexual abuse. Trial counsel stated that K.B. and B.B. "always wanted to go back and live with their mother." He said that the defendants were "very strict" but that the victims' mother "let them do pretty much whatever they wanted." Moreover, he asserted that K.B. was angry about the whipping she received from Defendant and that she made up the allegations to "get even" with Defendant and Co-Defendant Robinson. Trial counsel noted that there was no physical evidence to support the claims of sexual abuse, no confession, and no witnesses who "ever saw inappropriate behavior" by the defendants. Trial counsel continued, "The evidence is simply the allegation of two individuals . . . and I believe you'll see much of their statements will be inconsistent, and the whole story is simply not credible."

Although the proof at trial showed that K.B. had not spoken to her mother for some time prior to her allegation of sexual abuse, B.B. stated that she had spoken to her mother before disclosing to DCS that she had been sexually abused by Defendant. Moreover, trial counsel was able to establish that the victims had a motive to lie. On cross-examination, K.B. agreed that she was angry at Defendant after he whipped her with the belt. She also acknowledged that she always wanted to go live with her mother; she stated that Defendant and Co-Defendant Robinson were strict, would not let her date, and would not let her on Facebook and that her mother was more lenient. Likewise, B.B. acknowledged that her mother was less strict than Defendant and Co-Defendant Robinson. She said that, after returning to live with her mother, she was able to have a cell phone, date freely, and she stopped going to school. Trial counsel was also able to point out inconsistencies in the victims' testimony during cross-examination.

Defendant cites *State v. Zimmerman*, 823 S.W.2d 220 (Tenn. Crim. App. 1991), to support his claim that trial counsel was ineffective. In *Zimmerman*, defense counsel brought on co-counsel two days prior to trial. *Id.* at 221. Co-counsel announced during opening statement that the defendant, who was accused of stabbing her husband to death, would testify and that a psychologist who had treated the defendant would explain the "battered wife syndrome." *Id.* at 221-22. The defendant and witness were scheduled to testify. *Id.* at 221. However, when the State rested, counsel recommended to the defendant that she not testify, against the advice of co-counsel. *Id.* at 222. The defendant decided not to testify, and neither the psychologist nor the other defense witnesses were called to testify. *Id.* Additionally, counsel forgot to introduce into evidence a stipulation that the victim's blood alcohol level was .11 percent. *Id.* at 225. On appeal, this court held that nothing had changed following the opening statement to cause a sudden change in defense strategy. *Id.* at 226. The court explained that this factor alone did not constitute ineffective assistance of counsel but that, taken cumulatively with other errors, namely the failure to call any defense witnesses to testify and counsel's recommendation to the defendant that she not testify, the defendant was entitled to a new trial. The court

concluded, "It may be that none of these three areas of deficient performance, standing alone, would have justified the grant of a new trial. Yet, we think that the cumulative effect of these errors deprived the defendant of a meaningful defense." *Id.* at 228.

Unlike *Zimmerman*, trial counsel in this case presented numerous defense witnesses, and Defendant testified. Trial counsel presented multiple theories of defense, supported by the evidence, to establish a motive for the victims to fabricate the sexual abuse allegations. Additionally, trial counsel elicited testimony from B.B. that she had spoken to her mother about the sexual abuse before making the allegation of sexual abuse to DCS; thus, there was at least some basis in the evidence for trial counsel's argument that the victims' mother may have had some influence on the victims' allegations.

Another important distinction from *Zimmerman* is that the jury in this case had the opportunity to hear directly from Defendant; he did not rely solely on trial counsel to speak for him. We note, however, that Defendant's testimony was contradicted by Co-Defendant Robinson on several key points. Defendant testified that, when he whipped fourteen-year-old K.B., she was wearing underwear. Co-Defendant Robinson, however, testified that K.B.'s pants and underwear were removed before Defendant bent her over and whipped her. Defendant stated that, when the victims would get out of the shower, he could still "smell . . . their vaginas through their clothes," and he would make them get back into the shower. However, Co-Defendant Robinson testified that Defendant never expressed any concerns about the victims' vaginal cleanliness to her. Co-Defendant Robinson claimed that Defendant was never left alone with the victims and that she was always with them, but Defendant admitted that he was home with the victims when Co-Defendant Robinson was not there.

Under these circumstances, we conclude that Defendant has failed to establish a reasonable probability that, but for trial counsel's assertion during opening statement that the victims' mother encouraged them to falsify the allegations against Defendant, the results of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Defendant is not entitled to relief based on this claim.

### C. Failing to Ensure that Trial Counsel was Physically Able to Proceed

Defendant contends that trial counsel was "clearly ill" at the start of trial and that the trial court abused its discretion by failing to ensure trial counsel was physically able to proceed. Defendant additionally contends that trial counsel rendered deficient performance by failing to ask for a continuance and that he was prejudiced by trial counsel being "too ill to satisfy his professional duties[.]"

The State responds that Defendant's claim that the trial court erred in failing to ensure that trial counsel was physically able to proceed with trial is waived because trial counsel did not request a continuance. The State additionally responds that Defendant has not established ineffective assistance based on trial counsel's failure to request a continuance, noting that trial counsel testified at the motion for new trial hearing that, if he had felt like he could not handle the trial, he "certainly" would have asked for a continuance. Moreover, trial counsel said that he was no longer suffering from nausea by the beginning of the trial and that he was "certainly able to function."

We agree with the State that because Defendant failed to request a trial continuance, Defendant has waived the issue that the trial court erred by not continuing his trial. *See* Tenn. R. App. P. 36(a). The Tennessee Rules of Appellate Procedure provide that, on appeal, "[n]othing . . . shall be construed as requiring relief [to] be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). This rule "is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Tenn. R. App. P. 36, Advisory Comm'n Cmts.

Moreover, Defendant has failed to establish ineffective assistance of counsel based on trial counsel's failure to request a continuance due to illness. At the motion for new trial hearing, trial counsel testified that he felt "very sick" on the Saturday before trial, and he contemplated requesting a continuance of Defendant's trial that was scheduled to begin on Monday. Trial counsel testified, however, that on Sunday, he believed he would be able to proceed with the trial as scheduled if he rested that day, and he noted that he had prepared the case for trial multiple times. Trial counsel explained that he had been Defendant's counsel for approximately four years by the time of trial, and over the course of his representation, he had filed multiple pretrial motions, conducted several pretrial hearings, and served as counsel on the first trial on Counts 1 and 2. Trial counsel testified that he brought up his illness to the jury to explain why his voice might be raspy, but he said that he was physically able to proceed to trial and that he would have requested a continuance had he felt otherwise. Because trial counsel felt well enough to proceed with the trial, his failure to request a continuance was not deficient performance. Moreover, based on his testimony at the motion for new trial hearing, trial counsel would have told the trial court that he felt well enough for trial if the court had questioned trial counsel about his ability to proceed. Thus, Defendant is not entitled to relief based on this claim.

**D. Failure to Remedy Statements Made During Voir Dire by a Potential Juror**

Defendant contends that the trial court erred by not "striking the venire, declaring a mistrial, or providing a better limiting instruction" after Mr. Sparks stated during voir dire that "only guilty people get indicted." Defendant acknowledges that the trial court properly excluded Mr. Sparks and provided an instruction to the remaining jurors as requested by trial counsel. However, Defendant argues that the trial court should have "told (or asked if [the potential jurors] understood) the different standard of proof considered by grand juries." He further contends that trial counsel rendered ineffective assistance of counsel based upon his failure to request a mistrial or order "a new venire."

The State responds that because Defendant did not request a "better limiting instruction," a mistrial, or that the trial court strike the venire, Defendant has waived consideration of this claim. The State argues that, waiver notwithstanding, the trial court issued an appropriate curative instruction and that Defendant has not shown any prejudice as a result of Mr. Sparks' comment. Regarding the claim of ineffective assistance of counsel, the State responds that trial counsel requested that the court instruct the jury that Mr. Sparks' statement was false and to explain that grand juries do not hear all the evidence. Additionally, trial counsel testified that it was a strategic decision not to strike the venire because he believed the venire was favorable for the defense based upon the answers during voir dire.

We agree that Defendant waived consideration of this issue by failing to "take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Defendant did not request an instruction regarding the standard of proof for grand juries nor did he request a mistrial or that the trial court strike the venire—all of which he could have done. Accordingly, he has waived our consideration of his claim that the trial court erred when it failed to strike the venire, declare a mistrial, or provide a better curative instruction.

However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also*

*State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Defendant has not demonstrated that he is entitled to plain error relief. A mistrial should be declared in a criminal trial only in the event of a "manifest necessity" that requires such action. *State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The determination of whether to grant a mistrial rests within the sound discretion of the trial court, *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994), and the reviewing court should not overturn that decision absent an abuse of discretion. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). Moreover, the burden of establishing the necessity for a mistrial lies with the party seeking it. *Williams*, 929 S.W.2d at 388.

The trial court excluded Mr. Sparks and instructed the venire as requested by Defendant, as follows:

> Just so it will benefit the others, a grand jury does not hear all of the evidence and oftentimes they don't even hear from the alleged victim. They just hear some summary of the things. But I just want to make sure everybody else can provide [Defendant] with the presumption of innocence. Can you do that? Because . . . he only has to be here, and that's it. The State has to prove him guilty. He doesn't have to do anything. [Trial counsel] doesn't have to do anything. He doesn't even have to ask any questions. I suspect he will, but he doesn't have to. All the burden is on the State. Can everybody accept that principle of law?

The venire then agreed that they presumed Defendant's innocence, and they acknowledged that the burden was on the State to prove Defendant's guilt at trial. The jury is presumed to have followed the trial court's curative instruction. *Hall*, 976 S.W.2d at 148. Thus, Defendant has not shown a manifest necessity for a mistrial. Moreover, trial counsel testified that it was a tactical decision not to request any relief other than a curative instruction because he was happy with the venire. Defendant has not established that a clear and unequivocal rule of law was breached or that his waiver of the issue was not a tactical decision. He is not entitled to plain error relief. *See Adkisson*, 899 S.W.2d at 640-41.

Likewise, Defendant is not entitled to relief based on his claim that trial counsel rendered ineffective assistance of counsel by failing to request that the trial court declare a mistrial, strike the venire, or provide a different curative instruction. Trial counsel testified that it was a strategic decision not to request a mistrial when Mr. Sparks made the statement about the grand jury. He explained that the answers he was receiving from jurors on the panel were "exceptionally good," and he thought, "I love this panel." He stated that he did not want to get rid of the venire because he liked their answers to his questions. Trial counsel agreed that he asked for a curative instruction from the trial court but said that, upon further consideration, he should have asked the trial court to explain the burden of proof for the return of an indictment. However, this court must review trial counsel's performance without the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Moreover, we will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson*, 197 S.W.3d at 790. Trial counsel acknowledged that both sides discussed the State's burden of proof during voir dire; additionally, the trial court properly instructed the jury that Defendant was presumed innocent of the charges against him and that it was the State's burden to prove his guilt beyond a reasonable doubt. Defendant has failed to establish deficient performance or any resulting prejudice. This issue is without merit.

### E. Cumulative Testimony During Defendant's Cross-Examination

Defendant further asserts that the trial court erred in allowing cumulative testimony during his cross-examination, in violation of Tennessee Rule of Evidence 403. He argues that, over defense objection, the State was permitted "to essentially repeat its entire case by asking [Defendant] during cross-examination whether he was 'aware of' or 'remember[ed]' virtually every accusation being made." Defendant asserts that the State's cross-examination allowed it to "backdoor" prior consistent statements that were inadmissible under Tennessee Rule of Evidence 613.

The State responds the trial court did not abuse its discretion by permitting the State to exercise its right to effectively cross-examine Defendant. The State argues that it was entitled to cross-examine Defendant about every charged instance of abuse and about whether Defendant denied each incident. The State further argues that it was tasked with establishing each count beyond a reasonable doubt and that asking Defendant if he denied every allegation was certainly relevant.

In denying relief on this issue, the trial court found that the prosecutor's questions fell within appropriate parameters for cross-examination. Rule 611 of the Tennessee Rules of Evidence provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" Tenn. R. Evid. 611(b). "Trial

judges are empowered with great discretion regarding the trial process, including the scope of cross-examination." *Williams*, 929 S.W.2d at 389. The trial court's discretion will not be disturbed unless an abuse of discretion is found. *Id.*

On direct examination, Defendant made a blanket denial of having touched the victims inappropriately. The only offense that Defendant discussed in detail was the charge relating to his whipping K.B., and he had already been tried on that charge. We agree with the State that the prosecutor was entitled to cross-examine Defendant about every charged instance of abuse as the State was required to establish each count beyond a reasonable doubt. The prosecutor's questions to Defendant were relevant, and by testifying, he opened himself up to cross-examination about each charged offense. We note that, while being questioned by the prosecutor, Defendant was given the chance to reaffirm his claim that the victims were lying. Further, we note that the prosecutor's questions were not evidence and that the trial court instructed the jury as such. The prosecutor's line of questioning was relevant and appropriate, and the trial court did not abuse its discretion in allowing the questions.

Defendant contends that "the questioning was also an improper attempt to introduce prior consistent statements[,]" citing *State v. Herron*, 461 S.W.3d 890 (Tenn. 2015). In *Herron*, our supreme court concluded that playing a recorded forensic interview during the victim's direct examination, which was consistent with her trial testimony, before defense counsel cross-examined the victim or mounted any attack on the victim's credibility was error. *Id.* at 905. The supreme court noted one exception to the general rule against the admission of a prior consistent statement permits the admission of prior consistent statements to rehabilitate a witness whose testimony is attacked on cross-examination as a "recent fabrication" or "deliberate falsehood." *Id.*

The instant case is clearly distinguishable from *Herron*. Defendant's trial counsel asserted in opening statement that the victims had multiple reasons to lie about the allegations of sexual abuse, and he vigorously cross-examined both victims to attempt to establish that they falsified the allegations. For his part, Defendant stated that the victims were lying when they testified. In contrast, the trial court in *Herron* admitted the recording of the victim's forensic evaluation during her direct examination when no question had been raised about her credibility, nor had it been alleged that she had lied.

The trial court did not abuse its discretion by permitting the prosecutor to cross-examine Defendant about each charged offense. Defendant is not entitled to relief.

## F. Improper Leading Questions

Defendant asserts that the trial court erred in allowing the State to ask improper leading questions to a witness, in violation of Rule 611(c) of the Tennessee Rules of Evidence. He contends that the substance of the State's leading questions was contrary to the witness's prior answers and that, by its questions, the State "planted evidence in the [witness's] testimony[.]"

The State responds that the trial court did not abuse its discretion in allowing the State to effectively question the victims. The State argues that the trial court "properly concluded that the State was entitled to some leeway in questioning the victim of childhood sexual abuse. Furthermore, the State did not plant ideas in the victim's testimony; she testified consistently and the State properly elicited clarifications only."

Trial courts are vested with the authority to supervise the presentation of evidence. Tenn. R. Evid. 611(a). Tennessee Rule of Evidence 611(c)(1) provides in part, "Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness's testimony." It is well-established that a trial court may permit leading questions to victims in child sexual abuse cases. *See Swafford v. State*, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975); Neil P. Cohen et al., Tennessee Law of Evidence § 6.11[7][b] (6th ed. 2005) ("Courts traditionally permit leading questions to be asked on direct examination of a young or otherwise impaired witness. Leading questions are also permissible in some courts for sexual assault victims."); *see also State v. Craig Allen Lewis*, No. 01C01-9307-CC-00232, 1995 WL 10509, at *7 (Tenn. Crim. App. Jan. 12, 1995); *United States v. Rossbach*, 701 F.2d 713 (8th Cir. 1983) (holding that leading questions were permissible on direct examination of fifteen and seventeen-year-old victims hesitant to testify about sexual assault). "The propriety, scope, manner and control of examination of witnesses is within the trial court's discretion and will not be interfered with in the absence of an abuse of discretion." *State v. Harris*, 839 S.W.2d 54, 72 (Tenn. 1992) (citations omitted).

In his brief, Defendant cites the following passages from the trial transcript in support of his claim:

> [THE STATE]: Can you describe how he was touching your breasts? You can either use your hands, or you can talk about it.

> [K.B.]: Like how a boy will grab his girlfriend's breasts and like (indicating), like caress them like. I don't -- I can't describe it.

[THE STATE]: Okay. On that occasion did anything else happen that you can remember?

[K.B.]: No. Can you like -- can you be more specific?

[THE STATE]: Were there any other details that you remember from that occasion, or does that kind of summarize how it happened the first time?

[K.B.]: Yeah, that summarized.

[THE STATE]: Okay. Now, did he touch your vagina on that date or --

[TRIAL COUNSEL]: Judge, objection. Leading.

THE COURT: Overruled.

[TRIAL COUNSEL]: Judge, may we approach?

At the bench conference, the trial court stated, "A leading question would be isn't it true that he touched your vagina. Did he touch your vagina is not a leading question." Trial counsel responded, as follows:

[TRIAL COUNSEL]: Judge, I believe if . . . the witness has answered nothing else has happened, then that sums it up. And then she says, oh, by the way, did he also touch your vagina, that's certainly leading because she's already answered it and then she's --

THE COURT: That's not leading. You get a little bit of leeway with victims of sexual activity that happened a long time ago. I'm going to allow that. But that was not a leading question.

Trial counsel again objected following this exchange:

[THE STATE]: Did he touch your vagina at that time or only your breasts?

[K.B.]: Only my breasts.

- 45 -

[THE STATE]: Do you remember the next time he touched your breasts?

[TRIAL COUNSEL]: Judge, objection.  Leading.

THE COURT: Rephrase your question.

[THE STATE]: Do you remember the next time [Defendant] touched you?

[K.B.]: Yes.  But I was living at the other house.

. . . .

[THE STATE]: Did any other times specifically -- like can you remember the specifics about any other time that he touched you?

[K.B.]: No.

[THE STATE]: And why is that?

[K.B.]: Because I kind of don't -- don't want to talk about it and it's -- I didn't think it was wrong at the time, so I don't know.  I don't know.

[THE STATE]: Is it difficult for you to remember the specifics of any other time?

[K.B.]: Yeah.

[THE STATE]: Okay.  Did [Defendant] consistently touch your breasts from the age of ten --

[TRIAL COUNSEL]: Judge, objection.  Leading.

THE COURT: I'm going to overrule that one.

[THE STATE]: Did [Defendant] consistently touch your breasts from the time -- you testified about the age of ten -- until the time you moved out of the Robinson home at age fourteen?

[K.B.]: Yes.

- 46 -

In its order denying Defendant's motion for new trial, the trial court found that many of the questions to which trial counsel objected were not leading questions. Moreover, the trial court determined that any questions that qualified as leading in nature were properly allowed due to the age of the victim at the time of the offenses, the significant passage of time from the date of the offenses to the date of the trial testimony, the nature of the charged offenses, and the necessity to limit evidence relating to the severed physical abuse charge. The trial court further noted that K.B. did not simply limit her responses to a simple "yes" or "no" but that, after she agreed that encounters occurred, she added further detail about the incidents from her own memory.

Here, the trial court did not abuse its discretion. We agree with the trial court that some of the questions asked by the State were not leading questions and that, in other instances, it was within the trial court's discretion to allow the State some leeway to lead the witness. Although she was nineteen years old by the time of trial, K.B. was a victim of childhood sexual abuse and that abuse occurred frequently over the course of several years. We reject Defendant's contention that the State planted ideas into K.B.'s testimony; the State's questions helped to clarify her testimony concerning a subject that she found difficult to discuss. *See Craig Allen Lewis*, 1995 WL 10509, at *7. The trial court did not abuse its discretion in allowing the State to ask some leading questions of K.B., and Defendant is not entitled to relief.

### G. Admission of Evidence

Defendant contends that the trial court erred in admitting evidence of physical abuse, a prior consistent statement by B.B., and evidence regarding the reason for DCS's removal of the children. The State responds that the trial court did not abuse its discretion in the admission of evidence.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion" in ruling on the admissibility of the evidence. *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an

- 47 -

alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

## 1. Evidence of Physical Abuse

Following a pretrial hearing, the trial court issued a written order regarding the parameters for the admission of evidence of physical abuse, as follows:

> [A]lthough the sexual abuse counts were severed from the other charges, certain background information is necessary in the trial of the sexual battery and rape counts, particularly since injuries resulted in the police being called and disclosures made. The [c]ourt ruled, however, that the parties could not use the word "abuse" at trial and needed to use other terms such as "discipline", "restriction", or similar. Additionally, as discussed at the September 6, 2016 hearing, some evidence concerning [Co-Defendant Robinson] is necessary at trial in order to provide the jurors context. While the jurors may have to assess the culpability of [Co-Defendant] Robinson, the focus of the trial shall remain on [Defendant].

Defendant acknowledges that the trial court's pretrial ruling that evidence of the physical abuse was relevant to show the chain of events leading to K.B.'s initial physical examination and her disclosure of sexual abuse was proper. He contends, however, that the State exceeded the bounds of the trial court's ruling by presenting unnecessary and prejudicial evidence regarding K.B.'s injuries. Specifically, Defendant contends that the State should not have been permitted to introduce photographs of K.B.'s bruises, K.B.'s testimony regarding repeated strikes to her body and face, testimony that K.B.'s nose was bleeding, and testimony that Defendant "commonly" whipped both K.B. and B.B.

Defendant contends that the State, the trial court, and trial counsel "all bear some responsibility" for this error. He asserts that the State committed prosecutorial misconduct by "flagrantly" going above the limitations imposed by the trial court; that the trial court erred by not directing the State to cease introducing the evidence; and that trial counsel rendered ineffective assistance of counsel by failing to object to the State's questions at trial. We will address each claim in turn.

*a. Prosecutorial Misconduct*

*Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965), sets out the test to be applied by appellate courts in reviewing instances of improper prosecutorial conduct, *i.e.*, "whether the improper conduct could have affected the verdict to the prejudice of the defendant." In measuring the prejudicial impact of any misconduct, this court should consider: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003) (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984)).

In denying relief on this claim following the motion for new trial hearing, the trial court found that the State abided by its order and that the admission of evidence regarding the whipping was proper. Upon review, we agree with the trial court that the State did not commit any impropriety. The trial court's order advised the State not to dwell on the physical abuse in terms of how extensive it was, and the evidence offered by the State fell within the court's parameters. The trial court's order did not prohibit the State from presenting evidence that K.B. suffered physical injuries; rather, the order specifically noted that there were injuries to K.B. that resulted in the police being called and provided that this evidence was admissible to provide context for the disclosure of the sexual abuse allegations. Thus, the evidence offered by the State about injuries K.B. suffered from the whipping was not improper, and Defendant is not entitled to relief based on a claim of prosecutorial misconduct.

*b. Trial Court's Failure to Limit the State's Evidence*

Defendant asserts that the trial court erred in not directing the State to cease introducing this evidence. However, because trial counsel failed to raise contemporaneous objections to the evidence that Defendant now asserts fell outside the trial court's order, Defendant waived this issue. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitutes waiver of the issue on appeal.") In any event, although a trial court has the discretion to *sua sponte* limit irrelevant testimony, *State v. Combs*, 945 S.W.2d 770, 774 (Tenn. Crim. App. 1996), the trial court did not do so in this case because it concluded the State abided by its pretrial order. Defendant has not clearly shown that the trial court abused its discretion in admitting the evidence.

*c. Ineffective Assistance of Counsel*

Finally, Defendant argues that trial counsel rendered ineffective assistance of counsel based upon his failure to object when the prosecutor began to exceed the trial court's order. At the hearing on the motion for new trial, trial counsel testified regarding this issue that "[i]t was a pretty fine line we were trying to walk because there was an agreement that, all right, some of it was fair game because of the whole motive issue[,]" referring to the defense theory that the victims were motivated to make up the allegations of sexual abuse because "they were getting beatings." Trial counsel understood that the trial court was going to allow some of the evidence about the whipping, but he stated that, in his opinion, it "got way farther into that than what should have been allowed." As explained above, however, the State's evidence was not outside the bounds of the trial court's order, and the trial court acted within its discretion in admitting the proof. Therefore, Defendant has not established deficient performance or resulting prejudice under *Strickland*, and his claim of ineffective assistance of counsel fails.

## 2. Testimony of Ms. Howlett About Her Interview with B.B.

During trial counsel's cross-examination of B.B., the following exchange occurred:

> [TRIAL COUNSEL]: I think it's clear from your testimony a little while ago with the prosecutor, but first you said you were not sexually assaulted. You've made no mention of any sexual abuse when you were interviewed and first asked about it, correct?
>
> [B.B.]: Can you say that again?
>
> [TRIAL COUNSEL]: When you were first interviewed by the forensic interviewer after you left the [defendants], you made no mention of being sexually abused, correct?
>
> [B.B.]: No.
>
> [TRIAL COUNSEL]: All right. Then you went to live with your mother --
>
> THE COURT: Let's clear up about the answer. Are you saying no you didn't say it or -- you need to be clear by what you mean by no.

[B.B.]: No, I wasn't talking about it. Like can you say it one more time because you're confusing me.

[TRIAL COUNSEL]: Sure. Is it true that you did not -- when you gave your forensic interview, you did not accuse [Defendant] or [Co-Defendant Robinson] of any sexual abuse?

[B.B.]: Yes.

[TRIAL COUNSEL]: You did not?

[B.B.]: I didn't talk about it, yes.

. . . .

[TRIAL COUNSEL]: So after that, you go and live with your mother, you talk to your mother. And it's after that that you make an allegation of sexual abuse, correct?

[B.B.]: I didn't talk to my mom. She read the papers. She read it.

[TRIAL COUNSEL]: You --

[B.B.]: And when Ms. [Leeman] came, the DCS worker, is when I really started opening up about it.

. . . .

[TRIAL COUNSEL]: You spoke to your mother about [Defendant] sexually abusing you before you made the allegation to DCS, correct?

[B.B.]: Yes.

At a bench conference before the State's redirect, the prosecutor stated:

My recollection is she did give Our Kids the information about the touching prior to talking to her mom. Now, [trial counsel's] made it look like that . . . came after she talked to her mom. So I think I should be able to get into what she told Our Kids.

In response, the trial court stated:

- 51 -

Well, [B.B.'s] the one that said that she talked to her mom first before she talked to Our Kids. So[,] I'm not sure she's the one you need to ask about it. She's already answered it. I mean, if you're trying to establish she did that before she talked to . . . her mom, then I'm not sure she's the one you need to ask that. But you don't know when she talked to her mom. You'll have to establish that.

On redirect examination, this exchange occurred:

[THE STATE]: . . . [W]ell, let's talk about the forensic interview. When you were asked if you were touched inappropriately, you were fourteen-years old?

[B.B.]: Yes, sir.

[THE STATE]: Is that right?

[B.B.]: Yes, sir.

[THE STATE]: And what you said at that time was no?

[B.B.]: Yes, sir.

[THE STATE]: And the reason for that was?

[B.B.]: Because I was scared. I didn't know who I was going back with at that time. I didn't know I was going back with my mom. If I did know I was going back, I would have talked like I am now.

. . . .

[THE STATE]: At what point did you realize that the touching may have been wrong?

[B.B.]: When they had sent the packet through the mail with us talking to the lady, and my mama had broke down crying and she had asked [K.B.] about the tampon and --

[THE STATE]: Let me stop you right there. So when your mother . . . learned about this, you had already talked to Our Kids?

- 52 -

[B.B.]: Yes sir.

[THE STATE]: Okay. And you had told them during that time about the touching?

[B.B.]: Is Our Kids the same thing as -- is that the video?

[THE STATE]: No, that's a different -- June 26th is when they -- when you spoke with them.

[B.B.]: Uh-huh.

[THE STATE]: 2012. Do you remember that?

[B.B.]: Yes.

[THE STATE]: Do you remember speaking to a lady named Ms. Howlett . . . ?

[B.B.]: Yes.

[THE STATE]: Okay. And did you tell [Ms. Howlett] about these touchings with [Defendant]?

[B.B.]: Yes, sir.

[THE STATE]: Okay. And when you spoke to her, did you tell her that you would get out of the shower and that [Defendant] touched you on the vagina?

[B.B.]: Yes, sir.

The State then continued to question B.B. about the various allegations of sexual abuse and whether she told Ms. Howlett about them; B.B. agreed that she did. The trial court then instructed the jury, "Ladies and gentlemen, you've heard there may have been statements made at a prior time that were considered more consistent with [B.B.'s] testimony. You may only consider that as it relates to her credibility."

The State later called Ms. Howlett to testify. During her testimony, the following colloquy occurred regarding her June 26, 2012, interview with B.B.:

- 53 -

[THE STATE]: Okay. And did you have a conversation with [B.B.] about [Defendant]?

[MS. HOWLETT]: Yes, I did.

[THE STATE]: Okay. Can you, please, tell us about that conversation[?]

[TRIAL COUNSEL]: Judge, I'm going to object.

THE COURT: Approach the bench.

THE COURT: What is your objection?

[TRIAL COUNSEL]: Two grounds. First of all, it's a prior consistent statement meant [to] bolster credibility. This exam is . . . June 26th of 2012, well after the time that [the victims' mother] had contact with the kids. So I don't think it comes in as a prior consistent statement under the theory previously discussed by the State.

Secondly this is becoming so cumulative that it's ridiculous.

. . . .

THE COURT: It's a different child. So . . . if I recall, you asked her questions about what she said to her. As I recall, did you not? Because she first said no, didn't have any involvement, correct?

[TRIAL COUNSEL]: I don't believe I asked [B.B.] about --

THE COURT: Yes, you did.

[TRIAL COUNSEL]: -- what she told Our Kids.

THE COURT: You made a point of pointing out that she did not originally tell them.

[TRIAL COUNSEL]: No, that was DCS.

THE COURT: You said no at the forensic interview.

- 54 -

[TRIAL COUNSEL]: Right. This is not the forensic interview.

THE COURT: Yes, it is.

The State then argued:

I mean, they're statements for the purpose of medical diagnosis and treatment. It's absolutely -- the defense theory in this case is that this is all made up to go back and live with [the victims' mother]. The fact that she's saying this after, when she's already living with [her mother] and there's no difficulty, there's no fear of going to live back with the [defendants], again, shows her credibility.

The trial court overruled trial counsel's objection and allowed Ms. Howlett to testify about the allegations of sexual abuse made by B.B.

### a. Prior Consistent Statement and Cumulative Evidence

Defendant contends that the trial court erred in allowing Ms. Howlett to testify about prior consistent statements made by B.B. during her forensic interview. He asserts that Ms. Howlett's testimony was a prior consistent statement used to improperly bolster B.B.'s testimony and that it was cumulative to other testimony. The State responds that the trial court did not abuse its discretion in permitting the State to rehabilitate B.B. after her credibility was called into question.

As a general rule, evidence of a witness's prior consistent statements may not be used to rehabilitate the testimony of an impeached witness. *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980). However, if a witness has been impeached on the ground that his or her trial testimony was a recent fabrication or resulted from an apparent motive to lie, evidence of the witness's prior consistent statement is admissible to rebut the inference the that witness's testimony on direct examination was "the result of recent fabrication." *State v. Carpenter*, 773 S.W.2d 1, 11 (Tenn. Crim. App. 1989). Before prior consistent statements may be admissible, the witness's testimony must have been assailed or attacked to the extent that the witness's testimony needs rehabilitating. *State v. Benton*, 759 S.W.2d 427, 434 (Tenn. Crim. App. 1988). Moreover, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In this case, the defense strategy was to assert that the victims were lying and to establish their motives for doing so. To this end, trial counsel repeatedly asked B.B. during cross-examination whether she ever disclosed the allegations of sexual abuse before having contact with her mother. Trial counsel's questions to B.B. implied that she made the allegations of sexual abuse at the suggestion of her mother in order to be assured that she could live with her mother. In response to trial counsel's questions, B.B. agreed that she did not tell anyone about the sexual abuse until after she had contact with her mother. However, on redirect, the State elicited testimony from B.B. that she did not talk to her mother about the sexual abuse allegations until after her interview with Ms. Howlett at Our Kids.

Thus, it appears that B.B.'s interview with Ms. Howlett occurred after she had contact with her mother but before she discussed any allegations of sexual abuse against Defendant with her mother. Under these circumstances, we conclude that the record does not clearly demonstrate that the trial court abused its discretion in allowing Ms. Howlett to testify about B.B.'s statements in the forensic interview. *See McCaleb*, 582 S.W.3d at 186. B.B.'s credibility was attacked on cross-examination based on questions that implied she made the allegations of sexual abuse against Defendant at the suggestion of her mother. Evidence of B.B.'s prior consistent statement to Ms. Howlett—made before B.B. discussed Defendant's sexual abuse with her mother—could be admissible to rebut the inference that allegations came from the victims' mother. In our view, reasonable minds can disagree about the propriety of the trial court's decision; accordingly, Defendant's is not entitled to relief. *Id.*

### b. Ineffective Assistance of Counsel

Defendant argues in the alternative that trial counsel was ineffective for failing to clearly establish the sequence of B.B.'s interviews. However, from a review of the record, it is clear that the confusion during B.B.'s testimony cannot be blamed solely on trial counsel. In any event, Defendant has not established a reasonable probability that, but for trial counsel's failure to clearly establish the sequence of B.B.'s interviews, the results of the proceedings would have been different. *Strickland*, 466 U.S. at 694. Defendant is not entitled to relief based on this claim.

### 3. Evidence Regarding the DCS Removal

At trial, Defendant called Ms. Leeman, a DCS caseworker, to testify. During direct examination, trial counsel elicited testimony from Ms. Leeman about the victims and their siblings being removed from Defendant's home after the initial allegation of physical abuse was made. She explained that they were placed with Ms. Dillard, how long the placement lasted, why they were removed from Ms. Dillard's home, and whether

the victims' mother requested assistance with obtaining benefits upon receiving custody of the children. On cross-examination of Ms. Leeman, the State elicited testimony that the victims and their siblings were removed from Defendant's home. When the State asked "how that decision was made[,]" trial counsel objected on the grounds of relevance. The trial court overruled the objection but instructed the State not to "get too far in the weeds on that." Ms. Leeman explained that she interviewed "all of the children and any collaterals," reviewed "the investigation," and then discussed and decided what to do with her supervisor. Ms. Leeman agreed that "after conducting an investigation a decision was made to remove them from [Defendant's] home."

Defendant asserts that the testimony elicited from Ms. Leeman by the State had no probative value and was prejudicial "because it effectively allowed the State to present evidence that an investigation by DCS concluded [Defendant] was a danger to the [victims]." Defendant further asserts that the jury "likely treated Ms. Leeman as an 'expert witness' for practical purposes in child abuse investigations" and that the jury "would have given great weight to her conclusions that . . . the alleged victims were credible and . . . [Defendant] committed sexual assault."

"Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The Tennessee Rules of Evidence make "all relevant evidence" admissible. *See* Tenn. R. Evid. 402. As stated previously, Rule 403 of the Tennessee Rules of Evidence states that, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Here, Defendant had already asked Ms. Leeman on direct examination whether the victims and their siblings went to stay with Ms. Dillard or the victims' mother after being removed from Defendant's home. In response to Defendant's questions, Ms. Leeman testified that the children were removed on the date the physical abuse was disclosed, and then she provided the date they were moved from Ms. Dillard's home to their mother's home. We agree with the State that Defendant opened the door to questions about the removal of the children by asking questions about this subject on direct examination and that the State was entitled to cross-examine Ms. Leeman on the issue, subject to the trial court's limitation. We note that, in her testimony, Ms. Leeman did not provide any details regarding the decision to remove the children. Ms. Leeman never testified that K.B. and B.B. were credible or that she had concluded that Defendant was guilty of sexual assault. Moreover, Defendant cites no evidence to support his assertion that the jury would have treated Ms. Leeman as an expert witness. The trial court did not abuse

its discretion when it overruled trial counsel's objection as to relevance and allowed Ms. Leeman to testify about DCS's decision to remove the victims and their siblings from Defendant's home. This issue is without merit.

## H. Exclusion of Evidence

Defendant contends that the trial court erroneously excluded evidence that the defense sought to introduce, including: (1) evidence of an assault and violent tendencies of K.B.; (2) evidence of drug use; (3) impeachment evidence about sexual activity; (4) impeachment evidence from school records; (5) evidence of a false allegation of rape; (6) a question regarding juvenile court; and (7) Facebook posts. Defendant further contends that trial counsel rendered ineffective assistance of counsel in attempting to introduce evidence of K.B.'s violent tendencies, evidence of drug use, and evidence about sexual activity under Rule 404(b) of the Tennessee Rules of Evidence, instead of Rule 403. The State responds that the trial court did not abuse its discretion in excluding the evidence and that Defendant has not shown that trial counsel rendered ineffective assistance of counsel.

### 1. Evidence of an Assault and Violent Tendencies of K.B.

Defendant contends that the trial court erred by excluding "evidence of domestic assault" by K.B. against her mother, as well as evidence that K.B. had "violent tendencies." He argues that because K.B. testified on cross-examination that she had "never become violent" he should have been able to impeach K.B. with a document from Youth Villages that stated K.B. had "a history of domestic assault on her mom" and that K.B. reported she "becomes violent when she doesn't get her way." Defendant argues that the evidence of domestic assault and K.B.'s violent tendencies was relevant to the issue of what precipitated Defendant's whipping of K.B. He asserts that the trial court erred by excluding the evidence "under any standard."

During cross-examination of K.B., trial counsel asked K.B. to admit that she struck Co-Defendant Robinson on March 14, 2012. When K.B. denied hitting her, the following colloquy took place:

> [TRIAL COUNSEL]: All right. Do you admit that when you do not get your way you become violent?
>
> [K.B.]: I've never become violent. Why -- I've never ever did anything violent while living with them.

[TRIAL COUNSEL]: That was not exactly my question. Do you admit that when you do not get your way you become violent?

[K.B.]: No.

[TRIAL COUNSEL]: Do you recall going to a place called Youth Villages?

The State objected, and at a bench conference, the trial court asked trial counsel, "What is Youth Villages? What are you trying to prove?" Trial counsel then read the following from a Youth Villages' document: "[K.B.] entered DCS custody due to truancy. She has a history of domestic assault on her mom. She reports she becomes violent when she doesn't get her way." The trial court responded that the evidence did not "go toward honesty." The trial court continued:

[J]ust because you're saying that it shows that she made a different statement at some other time does not do away with my ruling that it's more prejudicial than probative because it doesn't go towards truthfulness in terms of talking about her violence. . . . [Y]ou can't set it up by saying well, see, Judge, she didn't talk about her violence therefore I get to bring it in on truthfulness. It doesn't work that way.

At the motion for new trial hearing, Defendant introduced a copy of the document from Youth Villages that is titled, "Youth Villages SCS Assessment Summary and Recommendations." The document reflects that the assessment was conducted on October 25, 2013, at the Davidson County DCS office.

Tennessee Rule of Evidence 402 states, "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. As previously stated, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rules of Evidence 608(b) provides, "specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than

convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . be inquired into on cross-examination." Tenn. R. Evid. 608(b). Before allowing such cross-examination to take place, the trial court, upon request, must hold a hearing outside the presence of the jury to determine whether the probative value of the alleged conduct outweighs its prejudicial effect and whether there is a factual basis for the inquiry. *Id.*; *State v. Morgan*, 541 S.W.2d 285, 390 (Tenn. 1976).

Here, we agree with the trial court that evidence of K.B.'s alleged domestic assault on her mother was not admissible as impeachment under 608(b) because it was not probative of K.B.'s character for truthfulness or untruthfulness. *See e.g., State v. James Thomas Manning*, No. M2004-03035-CCA-R3-CD, 2006 WL 163636, at *6 (Tenn. Crim. App. Jan. 24, 2006), *perm. app. denied* (Tenn. May 1, 2006) (holding that the victim's act of assaulting an individual other than the defendant in an unrelated incident was not probative of the victim's character for truthfulness or untruthfulness under Rule 608(b) and was not admissible); *State v. Clara Jean Neblett*, No. M2002-01494-CCA-R3-CD, 2003 WL 21145540, at *3 (Tenn. Crim. App. May 19, 2003), *perm. app. denied* (Tenn. Oct. 13, 2003) (concluding that the act of assaulting the defendant with a stick was not probative of the victim's truthfulness or untruthfulness and thus not admissible under Rule 608(b)). The evidence is not probative of truthfulness or untruthfulness, and it has little relevance to the issues being tried, *i.e.*, the sexual abuse that the victims alleged to have occurred. Accordingly, the trial court did not abuse its discretion in excluding evidence that K.B. allegedly committed domestic assault on her mother sometime after her removal from Defendant's home.

Additionally, we agree that K.B.'s October 2013 statement to Youth Villages— that she became violent when she did not get her way—was not probative of her truthfulness or untruthfulness, that K.B.'s "violent tendencies" were not relevant to the issues being tried, and that any probative value was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. Defendant argues that the trial court should have permitted him to impeach K.B. with her statement to Youth Villages after she denied on cross-examination that she becomes violent when she does not get her way. The trial court held that questioning K.B. about her statement to Youth Villages would result in wandering "into the weeds" as it did not relate to the case.

Under the collateral fact rule, a statement of a witness made during cross-examination as to a collateral fact may not be impeached by extrinsic evidence of a prior inconsistent statement as to that fact. *State v. Leach*, 148 S.W.3d 42, 56 (Tenn. 2004). A collateral fact is one which affords no reasonable inference as to the principal matters in dispute. *Id.* A fact is collateral for purposes of the collateral fact rule if it is relevant only because it contradicts something said in court; it is not collateral if it is relevant

- 60 -

independent of any contradiction. *Id.* The rule is essential one of relevancy. *Id.*; *see* Tenn. R. Evid. 401.

Here, the fact that K.B. reported to Youth Villages in October 2013, over a year and a half after leaving Defendant's home, that she became violent when she did not get her way was a collateral fact. Its only relevance was that it contradicted something K.B. said in court under cross-examination. The evidence was not relevant to the allegations that Defendant had sexually abused the victims. The record does not clearly establish that the trial court abused its discretion by precluding Defendant from questioning K.B. about: (1) her October 2013 statement in a Youth Villages document that she became violent when she did not get her way; and (2) K.B.'s alleged domestic assault on her mother. *See McCaleb*, 582 S.W.3d at 186.

Defendant alternatively contends that trial counsel rendered ineffective assistance of counsel by attempting to introduce this evidence in his pretrial motions under Tennessee Rule of Evidence 404(b). Defendant notes that Rule 404(b) applies only to a defendant in a criminal case, not to other witnesses and that the test in Rule 404(b) for balancing probative value against prejudicial effect differs from that established in Rule 403. To be excluded under Rule 403, the danger of unfair prejudice must "substantially outweigh" the probative value; however, under Rule 404(b), the danger of unfair prejudice must simply "outweigh" the probative value to render the evidence inadmissible.

Upon review, we conclude that Defendant has failed to establish prejudice resulting from this alleged deficiency on the part of trial counsel. *Goad*, 938 S.W.2d at 370. As explained above, K.B.'s October 2013 statement in a Youth Villages document that she became violent when she did not get her way and her alleged domestic assault on her mother were not admissible as impeachment evidence and held little to no relevance as to "any fact that [was] of consequence to the determination of the action." Tenn. R. Evid. 401. Thus, the evidence would have been properly excludable under both Rule 404(b) and Rule 403 of the Tennessee Rules of Evidence. Defendant is not entitled to relief under *Strickland*.

### 2. Evidence of Drug and Tobacco Use

Prior to trial, trial counsel filed a motion seeking to admit evidence, pursuant to Rule 404(b) of the Tennessee Rules of Evidence, of the victims' drug and tobacco use after they left the defendants' custody. Trial counsel stated at a hearing that evidence of tobacco use was contained in juvenile court records and evidence of drug use was "all over their Facebook." Defendant argued that the purpose of this evidence was to show the victims' motive to leave the restrictive environment of the defendants to the lax

household of their mother, where they were able to engage in such behavior. The trial court determined that the evidence was inadmissible because it "d[id] not go towards credibility, [was] not relevant, and [was] more prejudicial than probative."

On appeal, Defendant asserts that the trial court erred by excluding evidence of the victims' drug and tobacco use, arguing that the evidence was relevant and not overly prejudicial. The State responds that exploring collateral and subsequent misbehavior by the victims was not necessary or relevant. The State argues that evidence that the victims used tobacco or drugs after they left the defendants' custody was unnecessary to establish that Defendant's home environment was stricter because both victims specifically testified that Defendant and Co-Defendant Robinson were stricter than their mother. We agree with the State. The evidence held no relevance as to "any fact that [was] of consequence to the determination of the action," and even if it were marginally relevant, it would have been properly excludable under Tennessee Rule of Evidence 403. *See* Tenn. R. Evid. 401, 403.

Defendant additionally contends that the use of drugs by the victims was admissible pursuant to Tennessee Rule of Evidence 617 because the use of drugs impairs memory and perception. Rule 617 of the Tennessee Rules of Evidence provides, "A party may offer evidence that a witness suffered from impaired capacity at the time of an occurrence or testimony." Tenn. R. Evid. 617. Here, there was no evidence of drug use by the victims while they were living in Defendant's home, nor was there any suggestion that the victims were impaired at the time of their trial testimony. The record does not clearly demonstrate that the trial court abused its discretion by excluding the evidence.

Defendant also asserts, in one sentence in his brief that "[b]y denying [Defendant] the right to present evidence of the drug use of the two accusers, the [t]rial [c]ourt denied [D]efendant due process by denying Defendant the right to present a defense." Defendant offers no argument in support of his claim, however. For this reason, we conclude Defendant has waived this court's consideration of the issue. *See* Tenn. Crim. App. R. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court").

Finally, Defendant contends that trial counsel rendered ineffective assistance of counsel by seeking to introduce this evidence under Rule 404(b), rather than Rule 403, thereby making the evidence harder to admit. As previously noted, however, this proposed evidence held little to no relevance and, therefore, would have been properly excludable under Rule 403. Thus, Defendant has not established prejudice under *Strickland* and is not entitled to relief.

## 3. Evidence About K.B.'s Sexual Activity

Before trial, Defendant filed motions under Rule 404(b) and Rule 412 of the Tennessee Rules of Evidence, seeking to introduce evidence that K.B. admitted to being sexually active during her forensic interview at Our Kids. Following a pretrial hearing, the trial court ruled:

> [T]he defense may ask [K.B.] the general question as to whether she was sexually active with peers after she left [Defendant's] home during a jury out hearing during the trial. The [c]ourt is inclined to allow the testimony to be heard by the jury, but will make the final ruling as to whether her answer is relevant and admissible once the [c]ourt has heard from the witness.

During Defendant's cross-examination of K.B., the following exchange occurred:

> [TRIAL COUNSEL]: And the [defendants] would not let you date. We said that earlier, right?
>
> [K.B.]: Correct.
>
> [TRIAL COUNSEL]: And within three months or less you already were dating, correct?
>
> [K.B.]: No. No.
>
> [TRIAL COUNSEL]: All right. You weren't dating by June 2012?
>
> [K.B.]: No.

At a bench conference, Defendant sought to introduce extrinsic evidence of a report from Our Kids, which indicated that K.B. was sexually active as of June 26, 2012. Defendant argued that "if she's sexually active, I think that includes dating." In a jury-out hearing, K.B. denied that she had told anyone at Our Kids that she had sexual contact with someone her age after she had returned to her mother's custody. Defendant asked the trial court to allow "Ms. Littrell," an employee at Our Kids, to testify that K.B. reported being sexually active. He argued that the evidence was relevant to show motive behind the victim's allegations and for impeachment because K.B. testified that she was not dating. The State noted that it was the victims' mother, not K.B., who reported to Ms. Littrell that K.B. had been sexually active. The trial court ruled that Ms. Littrell's

report was inadmissible under Rule 412 of the Tennessee Rules of Evidence and that the evidence was not relevant.

On appeal, Defendant argues that the trial court abused its discretion by prohibiting him from impeaching K.B. regarding her testimony that she did not begin to date soon after leaving the defendants' custody with extrinsic evidence. He asserts that the evidence was relevant to establishing that K.B. had a motive to lie about the sexual abuse in order to live in a less restrictive household. Defendant contends that because trial counsel only asked K.B. if she was "dating," rather than "sexually active," Rule 412 was not applicable. He contends that the admissibility of the evidence "became governed by Rule 403, Rule 613, and the Collateral Fact Rule."

Tenn. R. Evid. 412(c)(2) provides that evidence of specific instances of a victim's sexual behavior is inadmissible unless it is offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim. Tenn. R. Evid. 412(c)(2). In this case, neither K.B. nor the State presented evidence regarding her sexual behavior after leaving Defendant's home; rather, Defendant asked K.B. if she started "dating" on cross-examination. Defendant claims that because he only asked K.B. about "dating," as opposed to being sexually active, Rule 412 does not apply. However, the evidence Defendant sought to introduce specifically stated that K.B. was sexually active and mentioned nothing about her dating. Because the evidence specifically related to K.B.'s sexual behavior, the trial court properly applied Rule 412, and the court did not abuse its discretion in determining that it was not admissible.

Defendant contends that the evidence was relevant, and as such, "whether [K.B.] was dating or sexually active was . . . not a 'collateral fact' and therefore subject to impeachment." However, the State noted at the jury-out hearing that it was the victims' mother, not K.B., who reported to Ms. Littrell that K.B. was sexually active. We agree with the State that Defendant could not have used someone else's statement as K.B.'s statement for purposes of impeachment. Furthermore, whether K.B. was sexually active after leaving Defendant's home was not relevant to establishing his guilt for sexually abusing her in the years prior. It was only relevant because it contradicted something K.B. said in court, if it is presumed that "dating" is synonymous with being sexually active. The trial court did not abuse its discretion by excluding the statement from the Our Kids report that K.B. was sexually active. This issue is without merit.

Defendant additionally contends that the trial court's ruling excluding evidence about K.B.'s sexual activity denied Defendant his constitutional right to confront the witness and his due process right to present a defense. Defendant raises these

constitutional challenges in one sentence in his brief and provides no argument in support of the claims. For this reason, we conclude Defendant has waived our consideration of the claims. *See* Tenn. Crim. App. R. 10(b).

Finally, Defendant argues that trial counsel rendered ineffective assistance of counsel in seeking to admit this evidence under Tennessee Rule of Evidence 404(b), rather than Rule 403. As stated above, the trial court properly determined that Rule 412 controlled the issue. Defendant, therefore, has not shown a reasonable probability that, but for trial counsel's failure to seek to admit the evidence under Rule 403, the results of the proceeding would have been different. Defendant is not entitled to relief.

## 4. Impeachment Evidence from School Records

During a hearing at the start of trial, trial counsel argued that he wanted to introduce school records to rebut testimony that arose at a pretrial hearing in which K.B. and B.B. testified B.B. "was beat so bad in the 5th grade that she missed a week or two of school[.]" Trial counsel argued that "the school records demonstrate that just did not happen. There was no time in 5th grade where [B.B.] missed an entire week of school. They had very regular attendance while at the [defendants']." Trial counsel asserted that the school records should be admitted "to impeach them on that testimony" and as substantive evidence to show that the victims were not "beaten on a regular basis[.]" The trial court responded, "[T]he issue you're trying to prove is that they, in fact, did go to school. Okay. How is that relevant? Other than the credibility of the witness how is that relevant in this case where the issue is whether or not these rapes occurred." Trial counsel stated that the evidence would not only "contradict[] their prior testimony but it shows . . . that it's possible that there never even was a beating because she never missed a week of school like they claim." The trial court determined that trial counsel could ask the victims if they had an explanation for the school records not showing that B.B. missed a week of school but that trial counsel would be "stuck with the answer." The trial court concluded that "whether or not [the victims] went to school [was] not a substantive issue" and that trial counsel had not "crossed the threshold of [Rule] 403[.]"

On cross-examination of K.B., the following exchange occurred:

[TRIAL COUNSEL]: Okay. [K.B.], do you recall stating that [Defendant] had beat [B.B.] so bad in the 5th grade that she missed an entire week of school?

[K.B.]: Yes.

[TRIAL COUNSEL]: That's not true, is it?

- 65 -

[K.B.]: That's true because he beat her with a stick.

[TRIAL COUNSEL]: But if the school records show that [B.B.] never missed an entire week of school ever in the 5th, 6th, or anywhere near that time frame, can you explain that?

[K.B.]: Well, they're lying because she did--

[TRIAL COUNSEL]: The school records are lying?

[K.B.]: Yes, because she stayed with Ms. [Dillard] at her job.

[TRIAL COUNSEL]: That's all I have, Judge, for now. Thank you.

On appeal, Defendant asserts that the trial court erred by prohibiting him from presenting the school records for impeachment purposes. He argues that the trial court applied the collateral fact rule "far too narrowly" and that the rule was "designed to exclude impeachment on facts that were irrelevant to start with, not simply facts that do not go to the ultimate issue." Defendant contends that "[t]he school records were admissible as independent evidence to demonstrate [K.B.'s] bias or false statement" and that the "proper inquiry was whether the evidence was relevant under Rule 403 pursuant to the [c]ollateral [f]act [r]ule."

The State responds that the trial court did not abuse its discretion by excluding school records to contradict K.B.'s testimony that Defendant had beaten B.B. in the fifth grade, resulting in her absence from school for one week. The State argues that introducing the school records to prove the "entirely unrelated issue of whether B.B. had in fact missed school" would have "taken the trial down an irrelevant path."

Here, we conclude that Defendant has failed to provide this court with an adequate record for review because the school records for B.B. were not included in the appellate record or entered as an exhibit for identification purposes at trial. We cannot adequately review the trial court's determination without the school records.

It is well-settled that when a party seeks appellate review, it has a duty to prepare a record which conveys a fair, accurate, and complete account of what transpired with respect to the issues forming the basis of the appeal. *See State v. Ballard*, 855 S.W.2d 557, 561 (Tenn. 1993) (holding failure to include transcript precludes appellate review); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (holding trial court's ruling was presumed correct in the absence of an adequate record on appeal). Where the record is incomplete, an appellate

court is precluded from considering the issue.  *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).  This issue, therefore, has been waived.

### 5. Evidence of K.B.'s "False" Allegation of Rape

Prior to trial, Defendant filed a motion under Tennessee Rules of Evidence 404(b) and 608, asserting that, after being removed from the defendants' home, K.B. made a false allegation that a boy from school raped her.  Defendant attached to his motion records from DCS regarding the allegation.  At a pretrial hearing, trial counsel explained:

> Judge, effectively what I would want to present would be the fact that [K.B.] made the report of rape.  We don't need to go into details of the alleged rape, but she made a report of rape, that it consisted of being someone she claimed was from her school and thirdly that then she was unable to identify that individual when they showed her yearbooks . . . and fourthly that she then later retracted the claim that it was someone from her school.  And then I would want to admit into evidence probably through testimony of one of the officers or [K.B.] if we can but whatever that no suspect was ever identified or arrested.

Trial counsel stated, "I think this allegation is patently on its face not believable because I think certainly we have to prove to some extent that the allegation is false."  He argued further:

> [K.B.] is in the middle of a very serious truancy problem.  She is not going to school.  She's getting cited for it, they're being called into Juvenile Court for this, her and her mother.  And she uses as her reason for not wanting to go to school is this alleged rape because I was raped by a boy at my school, that's why I don't want to go to school.  That's a fair interpretation of the DCS report, which I've attached, . . . that's her explanation of why she's not attending school.  So I believe that shows -- so now certainly if the allegation were true in the second allegation of rape, I would say it has no relevance to my case.  But because her second allegation about the phantom boy from school, . . . the reason that's relevant is because it shows if the allegation appears to be false, which I submit it does because of the claim that he went to my school and then they can't find anybody she I.D.s and then changes it from, well, okay, I don't really think he went to my school.  That demonstrates to me an attempt just to say something so that she doesn't have to go to school.  And then when she's put on the spot about it, she starts retracting.

- 67 -

Trial counsel stated that the subsequent rape allegation was relevant to Defendant's theory and that

> [K.B.] basically did the same thing in his situation although it was first. It was before the second allegation about the boy in school. She was in a situation she didn't want to be in. She wanted to get out, so she makes an allegation against [Defendant] of rape[.]

The trial court stated that there was "no evidence one way or another" as to the veracity of the subsequent rape allegation. Trial counsel responded that he could cross-examine K.B. about the subsequent allegation pursuant to Tennessee Rule of Evidence 608, without the trial court determining that the allegation was false. Trial counsel then acknowledged that, if he was allowed to cross-examine K.B. concerning the allegation under Rule 608, he would be "stuck with" her answers and that he could not "bring in the reports or the witnesses to contradict what she says."

In a written order, the trial court determined that the evidence was not admissible under Rule 404(b) or 608. The trial court initially noted that "Tennessee case law has been unclear as to whether 404(b) analysis is applicable in situations where the defendant charged with a sex crime alleges the victim has made a prior false allegation of rape[,]" citing *State v. Wyrick*, 62 S.W.3d 751, 771-80 (Tenn. Crim. App. 2001).[3] The court explained that in *State v. David Gene Hooper*, this court suggested that Rule 404(b) "*might* have provided the defendant an avenue for introducing testimony from [the individual the victim previously accused of rape and the accused rapist's daughter that the victim also alleged had been raped the same night] as substantive evidence, notwithstanding Rule 608." *State v. David Gene Hooper*, No. E2004-01053-CCA-R3-CD, 2005 WL 1981789, at *8 (Tenn. Crim. App. Aug. 16, 2005) (emphasis added), *perm. app. denied* (Tenn. Dec. 19, 2005); *but see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts (stating that "[t]he word 'person' in Rule 404(b) has been construed to refer solely to the defendant in a criminal prosecution"). Accordingly, the trial court analyzed the evidence under both Rule 404(b) and Rule 608.

---

[3] In *Wyrick*, this court held that a victim's prior false accusation of rape did not constitute "sexual behavior" as defined under Rule 412. *Id.* at 771. The court emphasized that "'[i]n the absence of proof that [the victim] falsified the other allegation,'" the prior allegation is immaterial and inadmissible at trial. *Id.* at 780 (quoting *State v. Willis*, 735 S.W.2d 818, 822 (Tenn. Crim. App. 1987)). Instead, the court determined that prior false reports of a sex crime "are relevant to a witness's credibility." *Id.* Therefore, such reports may be admissible under Tennessee Rule of Evidence 608(b). "Before a witness can be questioned about the specific instance of conduct, the court, upon request, must hold a jury-out hearing 'to determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry.'" *Id.* (quoting Tenn. R. Evid. 608(b)(1)).

The trial court stated:

Although the defense proposed a material issue (i.e., motive) for cross-examining [K.B.] about her October 2013 allegation as well as a list of circumstantial evidence supporting the defense theory that [K.B.] falsified the October 2013 rape report, . . . the admissibility of other crimes, wrongs or acts under Rule 404(b) is contingent upon the trial court finding by *clear and convincing evidence* that the act was actually committed. *Wyrick*, 62 S.W. 3d at 771. Here, Defendant has not shown by clear and convincing evidence that [K.B.] was or was not sexually abused by a peer or that she falsified any accusations against another person. No evidence has been presented to the Court that [K.B.] recanted her October 2013 disclosure nor has [K.B] made any statements akin to those made by the victim in *[David Gene] Hooper*. In *[David Gene] Hooper*, the court found the defendant had a "good faith basis" to ask "the victim whether she made a false allegation against [the accused prior rapist] to avoid the consequences of her [underage] drinking" because during the victim's proffer she testified that her friend, the accused rapist's daughter, denied having sex with her father (as the victim alleged occurred at the time she had been raped by her friend's father) when questioned by the authorities. *[David Gene] Hooper*, 2005 WL 1981789, at *8. Thus, in addition to no charges being brought against the victim's alleged prior rapist, evidence existed to corroborate the defendant's claim the victim made a false allegation. Here, the Court can only speculate whether [K.B.'s] October 2013 is truthful or false.

. . . .

Pursuant to Rule 608, specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness. If the witness denies the conduct, the party proffering the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence. Tenn. R. Evid. 608(b); *see also [David Gene] Hooper*, 2005 WL 1981789, at *8.

Before a witness can be questioned about the specific instance of conduct, the court must "determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). That is, there must be some factual basis for the prior false

report must exist before the party seeking to impeach the witness may ask about it. Tenn. R. Evid. 608(b)(1); *see also Wyrick*, 62 S.W.3d at 781.

> Absent any clear and convincing proof that the victim falsified the prior allegations, "then the fact that she accused another person of committing another sexual offense against her is immaterial." *State v Willis*, 735 S.W.2d 818, 822 (Tenn. Crim. App. 1987). Any previous sexual abuse suffered by the victim "would in no way reflect adversely on her credibility" and would therefore be irrelevant. *Id.* "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402.

*[State v. James Edward] Church*, No. M2014-01306-CCA-R3-CD, 2016 WL 520616, at *8 [(Tenn. Crim. App. Feb. 10, 2016), *perm. app. denied* (Tenn. Feb. 10, 2016)].

The trial court noted that in *James Edward Church*, this court applied a "clear and convincing evidence" standard as to whether a factual basis existed. 2016 WL 520616, at *8. The trial court reiterated that the Defendant had failed to establish by clear and convincing evidence that K.B.'s subsequent rape allegation was false and held that there was not a good-faith basis to cross-examine K.B. about the incident.

On appeal, Defendant contends that the trial court erred by excluding evidence of K.B.'s subsequent rape allegation made after she left Defendant's home. Defendant asserts that the allegation "was so lacking in credibility that it was shown to be most likely false" and that "a prior false allegation of rape is admissible to prove motive for an alleged current false allegation of rape[.]" He argues that K.B.'s claim "was so inconsistent and contradictory as to defy belief that any rape ever occurred." He contends that her false allegation was relevant because it was made when K.B. was summoned to juvenile court for truancy and was facing placement in juvenile detention, and he argues that "[t]his suggests a motive and history of concocting false sexual abuse allegations to get out of trouble." Finally, Defendant contends that the trial court "violated [Defendant's] due process right to present a defense and confrontation right" by excluding the evidence.

The State responds that the trial court did not abuse its discretion by excluding evidence that K.B. made a subsequent rape allegation against an unrelated individual. The State asserts that the proof did not establish that K.B.'s allegation against the unidentified boy was false and that "Defendant's attempt to label the incident as a false claim of rape is without merit."

Here, there was no clear and convincing evidence offered to show that K.B.'s subsequent rape allegation was false. Although he attached records of DCS referrals about K.B.'s subsequent rape allegation to his pretrial motion, Defendant did not provide any evidence that the information in the referrals was not true. In fact, we note that the DCS records indicate that K.B.'s subsequent rape allegation was "substantiated" but the perpetrator "unknown." At the pretrial hearing, Defendant did not call any witnesses to testify that the subsequent rape allegation was untruthful, and he failed to call witnesses or otherwise offer additional proof on the matter at the motion for new trial hearing. We are left only to speculate about whether K.B.'s subsequent rape allegation was false. Absent any clear and convincing proof that the victim falsified the allegation, "the fact that she accused another person of committing another sexual offense against her is immaterial." *Willis*, 735 S.W.2d at 822. Any subsequent sexual abuse suffered by K.B. "would in no way reflect adversely on her credibility" and would therefore be irrelevant. *Id.* Without proof that the allegation was false, we conclude that the trial court did not abuse its discretion in excluding the evidence. *See* Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible.").

Defendant also argues that the trial court should have admitted the evidence of K.B.'s subsequent rape allegation based on Defendant's "due process right to present a defense and confrontation right." We note, however, that Defendant's pretrial motion and argument to the trial court relied on Tennessee Rules of Evidence 404(b) and 608; Defendant did not make a constitutional claim. Accordingly, we conclude that Defendant has waived our consideration of this issue. *See* Tenn. R. App. P. 36(a); *see also State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."). In any event, the right to confrontation "does not mean that a defendant has a right to present irrelevant evidence." *State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997) (citing *Wood v. State of Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992)). Because Defendant failed to establish that the subsequent rape allegation was false, the evidence of the allegation is irrelevant, as trial counsel himself acknowledged during the pretrial hearing. He is not entitled to relief.

### 6. Question Regarding Juvenile Court

During trial counsel's cross-examination of K.B., the following exchange occurred:

> [TRIAL COUNSEL]: All right. And I'll bet you it made you angry, maybe even more angry, when [Co-Defendant] Robinson put you in the car and drove you down to juvenile detention, right?

> [K.B.]: No.

[TRIAL COUNSEL]: Well, I don't think you said what happened when you got down to juvenile detention. The reason she drove you down to juvenile detention was she said, you know, she was going to take you --

[THE STATE]: Objection, Your Honor.

[TRIAL COUNSEL]: Grounds?

[THE STATE]: Hearsay.

[TRIAL COUNSEL]: It's not for the truth of the matter. It's just--

THE COURT: Sustained.

[TRIAL COUNSEL]: All right.

[TRIAL COUNSEL]: Were you afraid you were going to go into juvenile detention?

[K.B.]: No, I wasn't scared.

[TRIAL COUNSEL]: Okay. Did it make you mad?

[K.B.]: No, because I knew I wasn't going to get in trouble when they saw the bruises.

[TRIAL COUNSEL]: Okay. So you knew you were going to be able to use the bruises to get the [defendants] in trouble?

[K.B.]: I mean, how are you trying to say it?

[TRIAL COUNSEL]: I'm just asking you knew you weren't going to be in trouble when they saw the bruises, right?

[K.B.]: Yes.

[TRIAL COUNSEL]: So you already at that time were thinking about using the bruises to get the [defendants] in trouble?

[K.B.]: No. I was thinking, well, maybe if they see the bruises, they'll take me away from this place and I wouldn't be hurt anymore.

- 72 -

Co-Defendant Robinson later testified that she told K.B. that juvenile detention was where disrespectful children ended up, in order to teach K.B. a lesson.

On appeal, trial counsel contends that the trial court erred by sustaining the State's hearsay objection. He contends that the statement was not offered for the truth of the matter asserted but was "asked in order to demonstrate the state of mind the statement could have created for [K.B.], which implicated the motive for [K.B.] to concoct the allegation of sexual abuse." Thus, Defendant asserts that trial counsel's question did not call for hearsay and should not have been excluded.

The State responds that the trial court properly excluded the statement as hearsay because Defendant sought to introduce the statement to prove why Co-Defendant Robinson had driven K.B. to juvenile detention and the testimony did not fall under any hearsay exception. The State further asserts that, even if the trial court erroneously precluded Defendant from cross-examining K.B. about the statement, any such error was harmless.

In *Kendrick v. State*, our supreme court addressed the standard of review applicable to the review of hearsay statements:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule—are questions of law subject to de novo review.

454 S.W.3d 450, 479 (Tenn. 2015) (citations omitted).

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802. However, this court has held that statements used to prove the effect on a listener are not hearsay:

[A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement.

*State v. Marvin Wendell Kelley*, No. M2011-02260-CCA-R3-CD, 2013 WL 5827646, at *10 (Tenn. Crim. App. Oct. 29, 2013) (quoting *State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App. Sept. 30, 2010), *perm. app. denied* (Tenn. Mar. 9, 2011)).

Here, Defendant asserted that Co-Defendant's statement to K.B. while they were in the car at juvenile detention was not hearsay because it was not offered for the truth of the matter asserted; it was offered to establish the effect the statement had on the listener, K.B. Thus, the statement was admissible. *See id.* However, we agree with the State that the error was harmless.

Because "evidentiary rulings ordinarily do[] not rise to the level of a constitutional violation[,]" we determine that this is a non-constitutional error that is subject to a harmless error analysis. *See State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003). The harmless error doctrine recognizes that the central purpose of a criminal trial is to decide factual questions of a defendant's guilt or innocence, and it promotes the public's respect for the criminal process by focusing on the underlying fairness of the trial rather than technicalities or "the virtually inevitable presence of immaterial error." *State v. Rodriguez*, 254 S.W.3d 361, 366 (Tenn. 2008). Under this analysis, a defendant must demonstrate "that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Id.* at 371-72 (quoting Tenn. R. App. P. 36(b)). When assessing the impact of a non-constitutional error, appellate courts must review the record as a whole, considering properly admitted evidence of the defendant's guilt. *Id.* at 372 (citing *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000)). "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." *Id.* (citing *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn. 2003); *State v. Francis*, 669 S.W.2d 85, 91 (Tenn. 1984)). Whether an error was harmless "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct." *Id.* Instead, appellate courts must determine what impact the error may have had on the jury's decision-making. *Id.*

Defendant has not shown that the trial court's exclusion of K.B.'s testimony as to what Co-Defendant Robinson told her in the vehicle more probably than not affected the outcome of the trial. As set out above, trial counsel asked K.B. about her state of mind

when Co-Defendant Robinson took her to juvenile detention, and Co-Defendant Robinson later testified that she told K.B. disrespectful children wind up in juvenile detention to teach her a lesson. Thus, the jury heard the statement. Moreover, trial counsel made no offer of proof as to what additional testimony K.B. would have provided if the trial court had allowed trial counsel's question. Because Defendant has not shown that the trial court's error more probably than not affected the outcome of the trial, he is not entitled to relief based on this claim.

Defendant also contends that the trial court's ruling denied Defendant "his right to confrontation, his right to due process, and his right to present a defense." He argues that, although Co-Defendant Robinson later provided the testimony, the exclusion of the statement during [K.B.'s] cross-examination deprived Defendant of the opportunity to pursue additional questions regarding her state of mind and to impeach her if she denied hearing the statement. However, trial counsel did not make this argument to the trial court when arguing the State's objection. The Tennessee Rules of Appellate Procedure provide that, on appeal, "[n]othing . . . shall be construed as requiring relief [to] be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). We, therefore, conclude that Defendant waived our consideration of this claim.

### 7. Facebook Posts

During cross-examination of B.B., she agreed that she sent Co-Defendant Robinson a friend request on Facebook after returning to live with her mother. She also agreed that she contacted Co-Defendant Robinson through email and told Co-Defendant Robinson, "[E]ven though I don't live with you anymore you will always be my mother, you taught me everything." She further acknowledged that she stated in a Facebook conversation that she wished she had her "old family back" and that she missed "everybody[.]" B.B. explained:

> And that was when I first got back with [my mother.] That was October. After October, you don't see any more messages. Me and my mom was [sic] on a bad note. All I knew was them and their people. That's all I knew for eight years was them.

During a break in proceedings, trial counsel sought to introduce hard copies of the Facebook posts into evidence. The trial court ruled that trial counsel could ask B.B. about the Facebook posts in order to impeach her testimony but that the posts were not admissible as substantive evidence. During further cross-examination of B.B., she acknowledged that she stated in a Facebook conversation with "Ariana" that she wished she had her "old family back, that [she] really miss[ed] everybody and to be honest [she]

miss[ed] [Co-Defendant Robinson]." Trial counsel then questioned B.B. about Facebook posts she made after a court hearing, in which B.B. stated, among other things, "I swear I'm beating everybody a**, catch that." B.B. acknowledged making the posts and stated that she made the posts out of anger. During this portion of her testimony, the court allowed trial counsel to place a copy of these posts on a projector for the jury to see, and the court admitted the Facebook posts B.B. made during the court hearing as an exhibit.

Defendant asserts that the trial court erred by prohibiting trial counsel from introducing additional Facebook posts made by B.B. He argues that the posts were admissible not only as impeachment evidence but also as "direct and substantive evidence that the rapes never happened under the theory that a person who was constantly raped does not wish for their old life back." Finally, Defendant contends that, by excluding this evidence, the trial court violated his right to present a defense and to confront witnesses.

The State responds that the trial court did not abuse its discretion by excluding the copies of B.B.'s Facebook posts. The State argues that B.B. admitted to writing the Facebook posts, and thus, Defendant was not entitled to impeach her with extrinsic evidence. Additionally, the State responds that the evidence was not admissible as substantive evidence because B.B. provided a clear explanation of why she wrote the posts and that the posts do not establish that the rapes never occurred.

Here, the record does not clearly show that the trial court abused its discretion in excluding the hard copies of B.B.'s Facebook posts from evidence. On cross-examination, trial counsel asked B.B. about the substance of her Facebook posts, and B.B. fully admitted that she wrote them. Her trial testimony was not inconsistent with the Facebook posts; accordingly, the trial court properly determined that Defendant was not entitled to present extrinsic evidence to impeach her testimony. *See* Tenn. R. Evid. 613(b). Moreover, Defendant has not established that the copies of the Facebook posts were admissible as substantive evidence. Again, B.B. admitted to the substance of the posts and that she wrote them. Presentation of the hard copies of the Facebook posts would have been unnecessary and cumulative; therefore, the trial court acted within its discretion in denying trial counsel's request to admit them into evidence. *See* Tenn. R. Evid. 403. This issue is without merit.

Defendant also asserts, in one sentence in his brief that "[t]his ruling denied [Defendant] the right to present a defense and to confront witnesses." Defendant offers no argument in support of his claim, however. For this reason, we conclude Defendant has waived this court's consideration of the issue. *See* Tenn. Crim. App. R. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate

references to the record will be treated as waived in this court"). Defendant is not entitled to relief.

## I. Appearance of Bias

Defendant next contends that he was deprived his due process right to an impartial judge due to the appearance of bias and partiality displayed by the trial judge against trial counsel and the defense theory. He asserts that the trial judge made "multiple antagonistic statements[,]" which caused "specific prejudice by influencing the jury into believing the [trial judge] had formed negative opinions about [Defendant's] defense." He contends that there was "at least an 'appearance of bias against defense counsel'" and that because the trial court's "impartiality might reasonably be questioned under an objective standard," the trial judge should have recused herself *sua sponte*. Defendant further asserts that trial counsel rendered ineffective assistance of counsel by not moving for a recusal, as evidenced by his own testimony about the impact he perceived of the trial court's animus on the case.

The State responds that the trial judge was not biased against Defendant. The State asserts that none of the instances cited by Defendant "reveal any bias or predisposition toward defense counsel, nor did the judge express or intimate any opinion on any fact at issue." Regarding Defendant's claim of ineffective assistance of counsel, the State responds that trial counsel's performance was not deficient that the outcome of the proceeding would have been different had counsel made such a request.

In denying relief on this claim following the motion for new trial hearing, the trial judge reviewed eight specific incidents wherein Defendant alleged the trial judge made "antagonistic statements towards [trial counsel]" that were "directly prejudicial" and caused jurors to believe that the trial court was hostile to trial counsel and, by extension, Defendant. The trial judge found that she maintained impartiality throughout the proceedings and noted that the statements cited by Defendant had to be "considered in the context of the full record[.]"

The Tennessee Supreme Court has recognized that there is "a due process right under the federal constitution to a fair trial before an impartial judge[.]" *State v. Benson*, 973 S.W.2d 202, 205 (Tenn. 1998). "[T]he denial of [a defendant's] right to an impartial judge is a constitutional error which affects the integrity of the judicial process. A new trial is the only remedy." *Id.* at 207. However, most questions of judicial disqualification are not constitutional because "the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Benson*, 973 S.W.2d at 205 (quoting *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)). The floor established by the Due Process Clause requires a "fair trial in a fair tribunal" before a judge with no actual bias

against the defendant or interest in the outcome of his particular case. *Bracy*, 520 U.S. at 904-05 (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). However, "the Due Process Clause has been implemented by objective standards that do not require proof of actual bias," which "as a practical matter may be impossible to prove." *Smith v. State*, 357 S.W.3d 322, 345 (Tenn. 2011).

A trial judge should recuse him or herself whenever the judge "has any doubt as to his ability to preside impartially in a criminal case or whenever his impartiality can reasonably be questioned." *Pannel v. State*, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001) (citing *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995)). Additionally, recusal is appropriate "when a person of ordinary prudence in the judge's position would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). A judge generally need not recuse him or herself if the bias or perceived bias is "based upon actual observance of witnesses and evidence during trial." *Id.* at 821. However, if the judge's bias is "so pervasive that it is sufficient to deny the litigant a fair trial, it need not be extrajudicial." *Id.* Whether to grant a motion to recuse rests within the discretion of the trial court, and this court will not reverse the trial judge's decision absent an abuse of discretion. *Hines*, 919 S.W.2d at 578. A trial court abuses its discretion "only when the trial court has applied an incorrect legal standard, or has reached a decision which is illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423 (Tenn. 2018).

A trial judge has broad discretion in controlling the course and conduct of the trial, and in exercising that discretion, the judge must be careful not to express any thought that might lead the jury to infer that he or she is in favor of or against the defendant in a criminal trial. *State v. Cazes*, 875 S.W.2d 253, 260 (Tenn. 1994) (citing *State v. Caughron*, 855 S.W.2d 526, 536 (Tenn. 1993)).

### 1. During Cross-Examination of B.B.

During trial counsel's cross-examination of B.B., the following exchange occurred:

> [TRIAL COUNSEL]: I think it's clear from your testimony a little while ago with the prosecutor, but first you said you were not sexually assaulted. You've made no mention of any sexual abuse when you were interviewed and first asked about it, correct?

> [B.B.]: Can you say that again?

[TRIAL COUNSEL]: When you were first interviewed by the forensic interviewer after you left the [defendants], you made no mention of being sexually abused, correct?

[B.B.]: No.

[TRIAL COUNSEL]: All right. Then you went to live with your mother --

THE COURT: Let's clear up about the answer. Are you saying no you didn't say it or -- you need to clear up what you mean by no.

[B.B.]: No, I wasn't talking about it. Like can you say it one more time because you're confusing me.

[TRIAL COUNSEL]: Sure. Is it true that you did not -- when you gave your forensic interview, you did not accuse [Defendant] or [Co-Defendant Robinson] of any sexual abuse?

[B.B.]: Yes.

[TRIAL COUNSEL]: You did not?

[B.B.]: I didn't talk about it, yes.

[TRIAL COUNSEL]: So if you didn't talk about it, you did not make the allegation, correct?

[THE STATE]: Asked and answered.

[TRIAL COUNSEL]: She's being evasive, Judge.

THE COURT: No, she answered your question. Move on.

[TRIAL COUNSEL]: So after that, you go and live with your mother, you talk to your mother. And it's after that that you make an allegation of sexual abuse, correct?

[B.B.]: I didn't talk to my mom. She read the papers. She read it.

[TRIAL COUNSEL]: You--

- 79 -

[B.B.]: And when Ms. [Leeman] came, the DCS worker, is when I really started opening up about it.

[TRIAL COUNSEL]: Are you denying under oath on this witness stand that you spoke to your mother about --

[B.B.]: No, I'm not.

[TRIAL COUNSEL]: Well, you just said a minute ago you said you didn't. So you did --

THE COURT: [Trial counsel], do not argue --

[B.B.]: My mama read the statements, and we was [sic] talking. I don't know how he's -- he's confusing me.

THE COURT: Let me finish interrupting here. [Trial counsel], don't argue with the witness and do not mischaracterize the testimony. Ask the question straight on about what you're trying to ask so it's not confusing.

[TRIAL COUNSEL]: You spoke to your mother about [Defendant] sexually abusing you before you made the allegation to DCS, correct?

[B.B.]: Yes.

Defendant contends that the trial judge's instruction to not argue with B.B. or mischaracterize her testimony showed bias against trial counsel. We disagree. The trial judge appropriately admonished trial counsel to ask his questions in a straight-forward manner after recognizing the confusing nature of the exchange between trial counsel and B.B. Not only did B.B. express that she was confused, but the trial judge, at one point, had to intervene to have B.B. clarify her answer. When B.B. again expressed confusion, rather than rephrase his question, trial counsel became argumentative. When the trial judge instructed counsel to ask the question in a straight-forward manner, trial counsel rephrased the question, and B.B. agreed that she had spoken to her mother about the allegations before she reported them to DCS. The trial judge's instruction to trial counsel was proper and did not create the impression of bias.

### 2. "Asked and Answered"

Defendant next contends that the trial judge made antagonistic statements towards the defense by ruling that a series of questions trial counsel asked B.B. on cross-

examination had been "asked and answered" and advising trial counsel to "move on." Defendant points to the following exchange:

[TRIAL COUNSEL]: But you did testify in October of 2013 that [K.B.] is going to do what she wants, correct?

THE COURT: Asked and answered.

[TRIAL COUNSEL]: Yes, ma'am.

[TRIAL COUNSEL]: So after leaving the [defendants], you got to date, correct?

[B.B.]: Yes. And I was dating when I was still staying with them, too.

[TRIAL COUNSEL]: Okay.

THE COURT: Asked and answered. Move on.

[TRIAL COUNSEL]: You got to do more on Facebook, correct?

THE COURT: Asked and answered, [trial counsel].

[TRIAL COUNSEL]: You didn't attend school regularly, correct?

[B.B.]: Because I was getting picked on.

THE COURT: Okay. Asked and answered. Move on.

[TRIAL COUNSEL]: I don't think I've asked her about school, Judge.

THE COURT: Yes, you did. And she just answered it.

[TRIAL COUNSEL]: You went joyriding?

[B.B.]: Yeah.

[TRIAL COUNSEL]: It's fair to say that your mother may have -- I wasn't there, you were. She may have said don't do this or do that. But

you and [K.B.] in reality were pretty much allowed to run and do whatever you wanted?

[B.B.]: No. No, not at all.

[TRIAL COUNSEL]: Tell me what you weren't allowed to do.

THE COURT: [Trial counsel], she answered your question.

A review of the trial transcript demonstrates that the trial judge properly determined that trial counsel's questions had been asked and answered. In fact, in the pages of the transcript immediately preceding the above-quoted exchange, trial counsel asked B.B. essentially the same questions. The trial judge's rulings were proper and in no way demonstrated a preference in favor of the State and against Defendant.

### 3. Cross-Examination of Ms. Donnell About Genital Exams

Defendant next cites to the following exchange as a specific incident in which the trial judge was hostile to trial counsel:

[TRIAL COUNSEL]: . . . You testified a few minutes ago that you conducted this genital exam. And I'm not sure of the words you used, I don't remember exactly, but it sounded like that was a matter of routine, that's something you do in every exam or not?

[MS. DONNELL]: Yes.

[TRIAL COUNSEL]: Okay. So in every case that there's an allegation of maybe physical abuse you also do a genital examination of every child based upon every type of physical abuse allegation?

[MS. DONNELL]: Yes.

[TRIAL COUNSEL]: Why is that?

[MS. DONNELL]: As I said earlier, when we're conducting a genital urinary exam, we're assessing for physical injury. So I'm looking for injury to that area that could possibly be from physical abuse because we see a number of cases every year where people incur physical abuse to the genital region.

[TRIAL COUNSEL]:  Well, sure.  But if the history given by [K.B.] involved no allegation of striking or physical abuse or rape, if that was not in her medical history, I'm not understanding why it's necessary to conduct a --

THE COURT: [Trial counsel], you're arguing with -- she said that's what they do.  Don't argue with her about what their procedures are.

Defendant contends that the trial judge's statement mischaracterized trial counsel's question and caused the jurors to believe that the court was hostile to the defense.  However, our review of the exchange supports the trial judge's conclusion that trial counsel was arguing with Ms. Donnell about the necessity of conducting a genital exam after a report of physical abuse.  Ms. Donnell had already explained several times the purpose of the "genital urinary portion of the exam" and stated that this was standard procedure in physical abuse cases.  The trial judge's instruction to trial counsel to not argue with Ms. Donnell does not demonstrate any bias or an appearance of bias against the defense.  This claim is without merit.

4. Cross-examination of Ms. Donnell About Children Providing False Statements

The next incident alleged by Defendant to show the trial judge's hostility towards the defense also occurred during trial counsel's cross-examination of Ms. Donnell, as follows:

[TRIAL COUNSEL]: Okay.  Do you receive any training in interviewing children not for medical purposes but for legal purposes?

[MS. DONNELL]: I have -- I mean, I have both.  Yes.  I have had training on interviewing children and read the literature on it with respect to medical interviewing of children but also in that -- I mean, it's very intertwined.  When I'm interviewing a child, it's for medical reasons.  It's not for legal reasons.

[TRIAL COUNSEL]: Okay.  And based upon the training you have you understand that the more interviews that are conducted of a child the more danger there is to wrong or false information being presented?

[THE STATE]: Objection, Your Honor.

THE COURT: Sustained.

[TRIAL COUNSEL]: On what grounds?

THE COURT: I said sustained. It's not -- it's not within her expertise, what she's talking about. So move on.

[TRIAL COUNSEL]: Well, I maybe misunderstood your answer. You don't have expertise in legal interviewing?

[MS. DONNELL]: I mean, I have expertise in medical legal interviewing. So medical -- it's for the purpose of obtaining a diagnosis in child physical abuse.

THE COURT: So asked and answered.

[TRIAL COUNSEL]: Judge, she has expertise to answer whether . . . multiple interviews of a child lead to false or incorrect information.

[MS. DONNELL]: Yes.

[TRIAL COUNSEL]: Okay. And certainly the way a question is phrased to a child can lead to false or incorrect information, correct?

[MS. DONNELL]: Yes.

In this instance, Ms. Donnell's testimony was initially unclear. She said, "When I'm interviewing a child, it's for medical reasons. It's not for legal reasons." Thus, the trial court's ruling that trial counsel's next question was beyond the scope of Ms. Donnell's expertise was proper. Even trial counsel acknowledged the confusion from her testimony stating, "Well, I maybe misunderstood your answer. You don't have expertise in legal interviewing?" Once trial counsel laid the proper foundation through additional questions, the trial judge allowed trial counsel to continue with the line of questioning, and Defendant obtained the answer he sought from Ms. Donnell. The trial judge ruled on an objection by the State and did not make harsh comments or otherwise demonstrate bias towards trial counsel. This issue is without merit.

5. Cross-Examination of Defendant

Defendant asserts that the trial judge "berated" trial counsel by stating, "Overruled. [Trial counsel], sit down. Overruled[,]" when trial counsel made an objection to the manner in which the State was cross-examining Defendant. Defendant

argues that a reasonable person could conclude that this signaled to the jury that the trial judge was biased against the defense and sided with the State.

The record reflects that trial counsel made an initial objection to the State's questioning of Defendant about the victims' specific allegations of abuse at a bench conference, as follows:

[TRIAL COUNSEL]: Judge, I have an objection.

(Bench conference.)

THE COURT: Yes?

[TRIAL COUNSEL]: Judge, I'm trying to think of the proper legal term. I guess I'll say cumulative. What the State is doing is they are trying to reintroduce all the testimony in front of the jury simply by going through all the answers, testimony, prior testimony, and asking [Defendant] is that a lie. There's no point to that. It's simply attempting to reintroduce testimony the jury has already heard.

THE COURT: This is cross-examination, and they're trying to compare this to things he said in the past. So overruled.

Thereafter, trial counsel continued to object to the form of the State's questions, renewing his earlier objection and seeking to add to the objection that the State's questions were prior consistent statements. It was at this point that the trial judge stated, "Overruled. [Trial counsel], sit down. Overruled." Based upon the trial judge's clear ruling at the bench conference, it was not improper for the trial judge to overrule trial counsel's objection and to tell him to sit down. Moreover, we agree with the State that, even if this exchange demonstrates that the trial judge was frustrated with trial counsel, that does not establish the bias that Defendant claims. A judge's irritation or exasperation does not establish the objective personal bias that would prevent a fair assessment of the merits of the case. *See Strouth v. State*, 755 S.W.2d 819, 823 (Tenn. Crim. App. 1986). This claim is without merit.

## 6. Instructing Trial Counsel to Clarify a Question

Defendant also contends that the trial judge's interruption of trial counsel during his cross-examination of B.B., in which the trial judge stated, "[Trial counsel], ask your question so it's not -- the question is did she see it before today. That's a separate question than what you really asked[,]" was another instance of the trial judge's

antagonistic statements towards the defense. Defendant acknowledges that the comment was not "highly prejudicial" but contends that "in conjunction with other comments made, the interruption signaled to the jury the trial court's hostility toward the [d]efense, because [trial counsel's] question was not deserving of rebuke." However, Defendant has not established any instances of bias, thus his claim of cumulative bias must fail.

### 7. Jury-out Admonition to Trial Counsel

Defendant asserts that the trial judge chastised trial counsel during a jury-out hearing and claims that the trial judge's comments provide "further evidence of at least an apparent bias" by the trial judge against trial counsel and Defendant. The record reflects that the trial judge had previously ruled that trial counsel could question K.B. as to whether she was sexually active after she left Defendant's home. However, during a jury-out hearing, trial counsel sought to present a witness to testify about K.B.'s sexual activity to impeach her. The trial judge advised counsel that they had already discussed the matter and that the proposed testimony was not relevant, stating "[Trial counsel], let's go back to what relevance means . . . ." The trial judge ruled that Defendant was not entitled to bring in a witness to testify about K.B.'s subsequent sexual activity and commented that trial counsel was trying to "parade in sexual activity of a witness[.]" As discussed previously, even if this comment reflected the trial judge's irritation with trial counsel, a judge's irritation does not establish the objective personal bias that would prevent a fair assessment of the merits of the case. *See Strouth*, 755 S.W.2d at 823. Defendant has not established that the trial judge was biased against the defense based on these comments.

### 8. Ruling on the Admissibility of Evidence at a Bench Conference

Defendant also contends that the trial judge expressed unwarranted frustration with trial counsel during a discussion about the admissibility of evidence at a bench conference. The record reflects that the trial judge had previously ruled that trial counsel could not cross-examine K.B. about "her violence." When trial counsel asked K.B. about her time at Youth Villages, the State objected. During a bench conference, trial counsel admitted that he was attempting to question K.B. about a statement she made to a social worker at Youth Villages that she became violent when she did not "get her way[.]" The trial judge explained that she had already ruled on the issue, noting that the statement did not go towards K.B.'s honesty. Trial counsel's argument to the trial court, which covers several pages of the transcript, eventually led the trial judge to say:

> THE COURT: No, I'm not going to change my mind about that. That's a different issue because you asked her, did you ever strike [Co-Defendant Robinson] and [Co-Defendant Robinson] says she did in the

course of this thing. That's one thing. That doesn't mean that you're going to wander out into the weeds about Youth Villages or whatever trying to show that, which doesn't have anything at all to do with this case. Okay.

[TRIAL COUNSEL]: Judge, for the record, again, just for the record --

THE COURT: And also I might add my rules are really clear that we needed to bring up any evidentiary issues beforehand, and the issues we talked about, about this, I've already ruled on. So I'm not sure exactly why we're revisiting this . . . .

[TRIAL COUNSEL]: Because things change in trial, Judge. You can't always predict exactly how things go. That's why.

THE COURT: Violence, no. Truancy, joyriding, all those you can cross her about. It goes toward credibility.

[TRIAL COUNSEL]: Judge, again, for the record --

THE COURT: We're done with this conversation. We're going to go back and --

[TRIAL COUNSEL]: Judge, I can't --

THE COURT: I've already ruled on it.

[TRIAL COUNSEL]: I need to protect the record.

THE COURT: You've already done that.

[TRIAL COUNSEL]: I have not. I have not. There is another reason why I want this in, and the Court of Appeals may want to know why I didn't bring it up and let you know.

THE COURT: [Trial counsel].

[TRIAL COUNSEL]: For the record, Court of Appeals the judge is shutting me down and not letting me explain why else --

THE COURT: You've already explained.

[TRIAL COUNSEL]: There is another reason I haven't stated yet.

THE COURT: What is the reason, [trial counsel], quickly?

[TRIAL COUNSEL]: Our theory is . . . that this is a false allegation of sexual abuse. This is relevant because if a witness -- if a young girl becomes violent when she does not get her way, I don't think it's a far step for her to be willing to make a false allegation of sexual abuse if she does not get her way. So that's the other reason it's relevant.

THE COURT: My ruling stands.

Defendant contends that the trial judge's "admonishment" was unwarranted and that it reflected an apparent bias against Defendant and trial counsel. We disagree. The trial judge had already ruled on trial counsel's request and allowed counsel to make multiple arguments regarding his theories of admissibility. We agree with the State that the trial judge, who had discretion in controlling the course and conduct of Defendant's trial, *Cazes*, 875 S.W.2d at 260, was trying to keep the proceedings moving as the trial was lengthy and contested. The trial judge did not show bias against trial counsel. This issue is without merit.

## 9. Ineffective Assistance of Counsel

Defendant asserts that trial counsel rendered ineffective assistance of counsel by not moving for the trial judge's recusal. The State responds that trial counsel's performance was not deficient for failing to request that the judge recuse herself and that Defendant has not established that the outcome of the proceeding would have been different had counsel made such a request.

We agree with the State. There is no evidence of actual bias on the trial judge's part, nor does the record provide reason to question her subjective determination that she should not have recused herself for lack of impartiality. Defendant has not established that any alleged bias stemmed from an extrajudicial source or resulted in an opinion based on anything extraneous to the case. Moreover, the trial judge's adverse rulings against Defendant do not justify disqualification, either. Accordingly, Defendant has not established that trial counsel's performance was deficient based on his failure to request the trial judge's recusal nor has Defendant established prejudice under *Strickland*. He is not entitled to relief.

## J. Cumulative Error

Finally, Defendant contends that the errors identified above collectively deprived him of a fair trial under the cumulative error doctrine. The State responds that Defendant has failed to establish cumulative error.

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. Because we have not found more than one error in this case, Defendant is not entitled to cumulative error relief.

## **Conclusion**

Based on the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE